2000 OK CR 14

**Donald Lee GILSON, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–98–606.**

Court of Criminal Appeals of Oklahoma.

July 26, 2000.

Rehearing Denied Aug. 29, 2000.

An Appeal from the District Court of Cleveland County; The Honorable William C. Hetherington, District Judge.

Rand C. Eddy, Kindanne C. Jones, Oklahoma City, OK, Counsel for Appellant at trial.

Tim Kuykendall, District Attorney, Richard Sitzman, Bonnie Clift, Assistant District Attorneys, Norman, OK, Counsel for the State at trial.

Matthew D. Haire, James H. Lockard, Timothy J. Gifford, Indigent Defense System, Norman, OK, Counsel for Appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer B. Miller, Assistant Attorney General, Oklahoma City, OK, Counsel for the State on appeal.

#### OPINION

LUMPKIN, Vice Presiding Judge:

¶ 1 Appellant Donald Lee Gilson was tried by jury for First Degree Murder (21 O.S. 1991, § 701.7(C)), Case No. CF–96–245; five counts of Injury to a Minor Child (10 O.S.Supp.1995, § 7115), Case No. CF–96–256; Conspiracy to Unlawfully Remove a Dead Body (21 O.S.1991, § 421(A)(5)), (Count I) and Unlawful Removal of a Dead Body (21 O.S.1991, § 1161), (Count II), Case No. CF–96–247; in the District Court of Cleveland County. The jury returned guilty verdicts in all counts except for three counts of Injury to a Minor Child (Counts III, IV and V. in Case No. CF–96–256). As punishment for the non-capital offenses, the jury recommended life imprisonment and a fine of five thousand dollars ($5,000.00) for two counts of Injury to a Minor Child; ten (10) years imprisonment and a fine of five thousand dollars ($5,000.00) for Conspiracy to Remove a Dead Body; and five (5) years imprisonment and a fine of five thousand dollars ($5,000.00) for Unlawful Removal of a Dead Body. The trial court sentenced accordingly. During the second stage of trial, the jury found the existence of two (2) aggravating circumstances and recommended the punishment of death. The trial court sentenced accordingly. From these judgment and sentences Appellant has perfected this appeal.[1]

¶ 2 On February 9, 1996, the skeletal remains of eight (8) year old Shane Coffman were found in an abandoned freezer located next to a mobile home formerly rented by his mother, Bertha Jean Coffman. A subsequent search of the mobile home revealed a photograph of Appellant. On February 11, 1996, authorities from the Cleveland County Sheriff's Office met with Appellant at his mobile home. Living in the mobile home with Appellant was Bertha Jean Coffman and her four children, twelve (12) year old Isaac, ten (10) year old Tia, eleven (11) year old Tranny and seven (7) year old Crystal. The children were immediately removed from the trailer and taken to Children's Hospital in Oklahoma City. Appellant and Bertha Jean Coffman were detained by the deputies.

¶ 3 Examinations of the children conducted in the emergency room revealed Tranny and Crystal were healthy with a few small scars on each. However, Isaac and Tia were mal-

1. Appellant's Petition in Error was filed in this Court on November 4, 1998. Appellant's brief was filed July 14, 1999. The State's brief was filed November 12, 1999. Appellant's reply brief was filed December 2, 1999. The case was submitted to the Court December 10, 1999. Oral argument was held March 28, 2000.

nourished and emaciated. Tia's feet were swollen and she had difficulty walking. She had gangrenous tissue on her right foot. On her right buttocks was a large open ulcer. Isaac was in the worst condition, emaciated and needing assistance to walk. He was malnourished and had several injuries, in various stages of healing, and scars throughout his body.

¶4 In their initial interview with police, Appellant and Coffman both denied any knowledge as to the manner in which Shane died. They stated he had run away from home during the early part of November and they had found him dead in the weeds near Coffman's trailer. They decided that putting him in the freezer would be the best thing to do. However, in subsequent interviews both Appellant and Coffman recanted this story and admitted to knowing more about the circumstances surrounding Shane's death. From interviews with Appellant, Coffman, the Coffman children and other witnesses, the following picture emerged.

¶5 The four Coffman children mentioned above, along with the murder victim in this case, and another brother, thirteen (13) year old Jeremy, lived with their mother Bertha Jean Coffman, in a mobile home. During the fall of 1994, the Cleveland County Sheriff's Department received complaints of sexual abuse committed upon one of the Coffman children by Coffman's then boyfriend (not Appellant). The investigating detective visited Coffman's mobile home and found the conditions deplorable and unsanitary. The children were removed from Coffman's home until conditions improved. It was about this time that Bertha Jean Coffman met Appellant. They were both working as janitors at Little Axe Schools. Appellant fixed up Coffman's trailer so she could get her children back. The children were subsequently returned to their mother.

¶6 Thereafter, Appellant began spending more and more time with Coffman and was given the authority to discipline the children. In June of 1995, the oldest child, Jeremy, ran away. The next month, Coffman and her children walked to Appellant's trailer for a visit and never returned to their home. Whatever possessions they had were left at Coffman's trailer. Appellant's trailer had only 2 bedrooms; Appellant and Coffman slept in one room and the other room contained Appellant's leather working material. As a result, all five children were forced to sleep on blankets in the living room. They were not permitted to go outside, but had to remain inside the trailer at all times. The children were taken out of school and claimed to be homeschooled by Coffman, although no evidence of homeschooling was ever found. The children were also not permitted to go to church.

¶7 Appellant and Coffman both disciplined the children. This discipline took several forms, including standing at the wall, sometimes for hours at a time, and beatings with a bamboo stick, a belt, boards, wooden rulers, metal ruler, and a bullwhip. The children were also made to sit in the bathtub, often for hours at a time. Food was withheld, particularly from Isaac and Tia, as punishment. The abuse inflicted upon Shane Coffman resulted in his death on August 17, 1995.

¶8 At trial, Tranny testified that he last saw his brother Shane sitting in the bathtub. Tranny said Shane had gotten in trouble for going to the bathroom on the living room carpet. He said that before Shane was put into the bathtub, Appellant beat him with a board. Tranny said Shane received several beatings with the board, all over his body. After the beating, Appellant put Shane into the bathtub. After a couple of hours, Shane was let out of the bathtub. He then got into trouble again. Tranny said Appellant and Coffman then took Shane outside the trailer. Tranny did not know what happened to Shane while he was outside, but he said he could hear Shane screaming. Appellant and Coffman carried Shane back inside the trailer. Tranny said Shane's arms were swollen, he was breathing "weird", and he had a soft spot on his head. Pursuant to Appellant's "house rules", the other children were not permitted to talk to Shane. Appellant then carried Shane to the bathroom and placed him in the bathtub. Tranny said he and the other children heard a few more screams and banging noises. He said both Appellant and Coffman were with Shane when they heard the screams. The children then decided to

try and go to sleep. He said they were awakened some time later by Appellant and Coffman and told that Shane had run away, and that Appellant and Coffman were going to look for him.

¶ 9 Isaac testified Appellant first sent Shane to stand at the wall for wetting the bed. While he was standing at the wall, Appellant hit him with a board. Appellant and Coffman eventually took Shane to the bathroom and put him in the bathtub. Isaac said Appellant made all the other children go to the bathroom and tell Shane what a bad boy he was. He said that both Appellant and Coffman remained in the bathroom with Shane while the children watched television. He said they could hear Shane crying. Isaac further stated that later that night, Appellant and Coffman told them Shane had run away.

¶ 10 In a statement made to police shortly after his arrest, and admitted at trial as State's Exhibit 2, Appellant stated that on August 17, 1995, he had put Shane in the bathtub as punishment. Appellant said he was trying to teach Shane a lesson, so he spanked him and put him in the bathtub where he was to remain until he stopped the disruptive behavior. He said the water in the bathtub was initially warm to help the pain from the spanking, but then he changed it to a cold bath. Appellant said Shane was crying as Coffman talked to him about his behavior. He said he then laid down on the couch to watch television with the rest of the kids where he eventually fell asleep. Coffman was in and out of the bathroom talking to Shane before she went to the bedroom to lay down. A while later, Coffman came into the living room in tears and told Appellant to come to the bathroom. He said Coffman had taken Shane out of the bathtub and laid him on the floor. Shane's lips were blue and he was not breathing. Appellant said he performed CPR for approximately an hour to an hour and half. When his efforts were unsuccessful, Appellant took the comforter off of his bed, wrapped Shane up and placed him back in the bathtub.

¶ 11 Appellant said he and Coffman discussed what to do next. He said Coffman was worried that the Department of Human Services (hereinafter DHS) would take her kids away if the authorities found out Shane had died. So they left Shane in the bathtub, waiting until the other children had gone to sleep to remove him from the house. Appellant said they carried Shane outside and placed him in the back of a truck. He said they discussed "just dumping him somewhere" or "bury[ing] him out in the middle of the boonies." But they decided neither of those options were right and "even though he wasn't alive he would still be part of the family bein (sic) on her property, . . . thought about putting him in the freezer, it wouldn't hurt him and then concreting it over. And making a flower bed out of it." So Appellant and Coffman took Shane's body to the freezer located next to Coffman's trailer and put him inside. Appellant said he and Coffman told the other children Shane had run away.

¶ 12 Bertha Jean Coffman testified at trial to disciplining her children by making them stand at the time-out wall, and spanking them, only on their bottoms, with a cloth belt or a wooden paddle. She also testified that Appellant disciplined her children by spanking them with the wooden paddle, but at various places on their bodies. Coffman stated Appellant had a quick temper and did not want the children tearing up his trailer.

¶ 13 In her statement to police on August 17, 1995, Coffman said she and Appellant found Shane sexually assaulting his younger brother. As punishment, they made him stand at the time-out wall, then Coffman paddled him. When Shane refused to stand at the wall, Coffman spanked him again. When Shane still would not do as Coffman directed, she screamed at him. Shane then fainted. When Coffman could not get a response from Shane, she put a piece of ice on his chest. When he still did not respond, Coffman picked him up and took him to the bathroom where she placed him in a tub of cool water. She said Shane eventually came to and wanted to get out of the tub. She said he slipped and hit his head on the faucet. Coffman stated she pushed on Shane's shoulders to keep him in the bathtub. They struggled, and the shower doors were knocked off their railing. Coffman called for Appellant to come and fix the doors. Appellant left the living room where

he had been watching television with the other children and put the doors back on their railings. Appellant left the bathroom. Coffman and Shane struggled again. Appellant returned to the bathroom to see what the noise was about. He saw the doors had fallen off again so he took them and set them on the floor. Coffman said she remained in the bathroom with Shane while Appellant went back to the living room.

¶ 14 After a while, Appellant stepped into the bathroom and told Coffman to leave Shane alone for a while. So Coffman left the bathroom to get Shane dry clothes and prepare lunch. When she saw that Appellant had already prepared lunch, Coffman laid down on her bed. She was awakened by a noise in the bathroom and saw Appellant coming out of the bathroom. When asked how Shane was, Appellant responded he was fine and that he was blowing bubbles. Coffman sat down to have a cup of coffee, then decided to check on Shane. She found him quiet and not breathing. She called for Appellant and they pulled Shane out of the bathtub and gave him CPR. She said they waited until the other children were asleep before taking the body to the freezer. Coffman also stated that once Shane died, Isaac and Tia began receiving the brunt of the discipline from Appellant.

¶ 15 Shane's skeletal remains were not found until approximately six (6) months after his death. Therefore, the medical examiner, Dr. Balding, was not able to make a determination as to the cause of death. The medical examiner did testify to injuries to certain bones which were evident upon his examination of the remains. The injuries included a fracture to the right jawbone. The injury was determined to be "acute" as it showed no signs of healing, and therefore was probably less than a week old at the time of death. Another fracture was also found on the left side of the skull. Dr. Balding testified the two fractures were the result of two different blunt force blows. A tooth was missing from the right jaw. Fractures were also found in the collarbone, shoulder blades, numerous ribs, both legs, and several vertebrae in the spine. All the fractures were ruled acute, and not the result of normal childhood play.

¶ 16 Appellant and Bertha Jean Coffman were jointly charged with first degree murder by child abuse in the death of Shane Coffman, and one count of injury to a minor child for the abuse suffered by each of the remaining children. They were also jointly charged with conspiracy to unlawfully remove a dead body and unlawful removal of a dead body. On August 20, 1997, approximately eight (8) months prior to Appellant's trial, Coffman entered *Alford* [2] pleas to all counts. Appellant was subsequently tried and convicted on all charges except he was found not guilty of committing injury to a minor child as to Jeremy, Tranny and Crystal. Any assignments of error raised by Appellant addressing those charges are rendered moot by Appellant's acquittal. Assignments of error are addressed in this opinion in the order in which they arose at trial.

### FIRST STAGE ISSUES

#### A.

¶ 17 In his first assignment of error, Appellant asserts the jury's verdicts as to child abuse and first degree murder by child abuse were obtained in violation of his right to unanimous verdicts under Article II, Section 19 of the Oklahoma Constitution, as well as the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. The record reflects that the charges against Appellant for child abuse and first degree murder by child abuse were both filed in the alternative, *i.e.*, that Appellant either committed the actual abuse or murder or that he permitted the abuse or murder to occur. At trial, after the close of evidence, the State submitted verdict forms for both offenses which listed not only the options of guilty or not guilty, but also stated:

FURTHER, we make the following finding of fact as to the basis for our verdict of guilty:

[ ] Unanimous as to child abuse

---

**2.** *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (provides for the entry of a plea of guilty while maintaining innocence).

[ ] Unanimous as to permitting child abuse

[ ] Divided as to the underlying theory.

(In the first degree murder verdict, "child abuse murder" was substituted for "child abuse").

¶ 18 No specific objection was offered by Appellant to the proposed verdict forms. Appellant did object to Instruction No. 14 instructing the jury that while their verdict of guilt as to first degree murder must be unanimous, they need not unanimously agree as to the theory under which they arrived at their verdict. The trial court adopted the verdict forms as offered by the State specifically stating that the interrogatory questions would be included on the verdict forms. No legal explanation was offered for the court's ruling. When the jury concluded its deliberations and returned its verdicts, in addition to finding Appellant guilty, the last box listed above ("divided as to the underlying theory") was checked on three of the forms, the two child abuse verdicts and the verdict for first degree murder by child abuse.

■ ¶ 19 In the first part of Appellant's argument, he contends the trial court erred in failing to require the jury to agree on the specific act supporting the verdict of guilt as to the child abuse counts, and as a result violated his state constitutional right to a unanimous verdict. Okla. Const., art. 2, § 19. Appellant directs us to *Cody v. State,* 361 P.2d 307, 320 (Okl.Cr.1961) as support for his argument that under Oklahoma law a conviction must be based upon one act. Appellant admits that defense counsel did not request the appropriate instructions; however he argues the trial court has a duty to *sua sponte* require the prosecution to elect which of the acts it will rely upon for conviction.

¶ 20 In *Cody,* the defendant was charged with committing one act of rape on a specific date. The evidence at trial showed that on the night in question two acts of rape occurred. This Court, finding that rape was not a continuous offense, held the conviction must be based upon but one act and that the trial court erred in failing to instruct the jury that they must unanimously agree upon the same criminal act or transaction. The Court stated in part:

that this rule is necessary for the reason that a defendant has a constitutional right to be put on trial for a single offense and for the further reason that he has a right to a verdict in which all of the jurors concur upon the same criminal act or transaction ... (citations omitted).

361 P.2d at 320.

■ ¶ 21 *Cody* is distinguishable from the present case. Appellant was charged with the crime of Injury to A Minor Child occurring "on or between the 1st day of July, 1995, and the 9th day of February, 1996." In *Huddleston v. State,* 695 P.2d 8, 10–11 (Okl. Cr.1985), this Court held that the general rule requiring the State to elect which offense it will prosecute is not in force when separate acts are treated as one transaction and that separate acts of abuse are one transaction for purposes of election of offenses. The Court stated:

We hold that when a child of tender years is under the exclusive domination of one parent for a definite and certain period of time and submits to sexual acts at that parent's demand, the separate acts of abuse become one transaction within the meaning of this rule.

*Id.; see also Drake v. State,* 761 P.2d 879, 882 (Okl.Cr.1988).

■ ¶ 22 In the present case, testimony was given that Appellant, assuming a parenting role over the Coffman children, abused Isaac and Tia over a period of several months. Therefore, his separate acts of abuse became one continuous offense. In his reply brief, Appellant argues that *Huddleston* is distinguishable from the present case as it was a case of sexual abuse and as the State failed to prove that the Coffman children were under his exclusive domination for a definite and certain period of time. The fact that *Huddleston* concerned the sexual abuse of children does not render it inapplicable in this case of physical abuse. The principles expressed in *Huddleston* concerning the repeated nature of abuse committed on a child by a parent or one acting in a parental role renders it applicable to the present case.

¶ 23 Here, Appellant, although not a parent of any of the Coffman children, acted in a parental role. The evidence shows that while the children lived in Appellant's trailer, he was the authoritative figure and dominant disciplinarian. This evidence is sufficient to meet the *Huddleston* criteria. Therefore, under the principles enunciated in *Huddleston*, the abuse suffered by the children was a continuous act and the State was not required to elect one specific act upon which to prosecute, nor was the jury required to agree on one specific incident of abuse to support a finding of child abuse. While the State could have elected to charge and prove separate acts of child abuse, it did not. Instead, the State elected to charge the acts of abuse as one continuous act during the period of time set out in the felony information. The trial court's failure to instruct the jury that they must agree on the specific act supporting the verdict of guilt as to child abuse did not deny Appellant his constitutional right to a unanimous verdict.

■ ¶ 24 In the second part of his argument, Appellant asserts his right to a unanimous verdict was violated by the verdict forms allowing the jury to return a "divided as to underlying theory" guilty verdict. Appellant argues that as he was charged in the alternative with child abuse murder by the commission of child abuse or by the permitting of child abuse which resulted in first degree murder, the jury's verdict showed a disagreement as to "just what [he] did." (Appellant's brief, pg. 22).[3] Appellant acknowledges this Court has said that a general verdict of guilt satisfies due process and unanimity concerns where a defendant is charged in the alternative with malice aforethought and felony murder, so long as a *prima facie* case is made for each alternative. *See James v. State*, 637 P.2d 862, 866 (Okl.

Cr.1981). However, he asserts his case is distinguishable by its unique circumstances. Appellant submits that the jury disagreement in his case went to the legal, rather than the factual, basis of the crime charged, "because 1) 'committing' and 'permitting' child abuse murder are conceptually distinct crimes and 2) these alternative theories of guilt are fundamentally repugnant to each other." (Appellant's brief, pg. 19–20). Appellant argues the contradictory nature of the alternative crimes charged is illustrated by the differing *actus reus* requirements for each crime.

¶ 25 The State argues in response that committing and permitting child abuse are merely different means by which child abuse murder may be committed. Citing cases from this Court, the State argues the jury was not required to agree on the specific means by which the crime was committed, only that the defendant committed the crime charged.

■ ¶ 26 Both Appellant and the State cite to *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). Appellant argues that *Schad* supports a finding that first degree murder by the commission of child abuse and first degree murder by permitting child abuse are separate offenses containing independent elements upon which the jury must be in unanimous agreement. The State relies on *Schad* for the proposition that where there are alternatives to proving the *actus reus* of the offense, there is no general requirement that the jury reach a unanimous agreement on the preliminary factual issues which underlie the verdict.

¶ 27 In *Schad*, the Supreme Court addressed the constitutionality of the Arizona Supreme Court's holding that a general verdict as to first-degree murder is permissible

---

**3.** At oral argument, Appellant argued that during deliberations, the jury sent out a note asking if they could find the defendant guilty of both committing and permitting child abuse. We have searched the record and find no such question from the jury. The only question asked by the jury during deliberations pertained to Count I, the abuse of Tia Coffman, and stated that the jury needed a clarification as to what was being asked in the "bottom of the document? Is this a one or more option?" With the approval of both the prosecutor and defense counsel, the trial judge referred the jury to Instruction No. 14 and said "I'll ask you to reread that and you may answer that in any number of options that your jury finds." Instruction No. 14 provided "[y]ou are instructed that although your verdict as to guilt of the crime of First Degree Murder must be unanimous, you need not agree unanimously as to the theory upon which you arrive at that verdict."

under Arizona law as premeditation and the commission of a felony are not independent elements of the crime, but rather are mere means of satisfying a single *mens rea* element. In its analysis, the Court looked "both to history and wide practice as guides to fundamental values, as well as to narrower analytical methods of testing the moral and practical equivalence of the different mental states that may satisfy the *mens rea* element of a single offense." 501 U.S. at 637–38, 111 S.Ct. at 2500.

¶ 28 The Court found the language of the Arizona first-degree murder statute was identical in all relevant respects to the language of the first statute defining murder by differences of degree, passed by the Pennsylvania Legislature in 1794. 501 U.S. at 641, 111 S.Ct. at 2502. The Court also looked to decisions from other state courts which agreed " 'it was not necessary that all the jurors should agree in the determination that there was a deliberate and premeditated design to take the life of the deceased, or in the conclusion that the defendant was at the time engaged in the commission of a felony, or an attempt to commit one; it was sufficient that each juror was convinced beyond a reasonable doubt that the defendant had committed the crime of murder in the first degree as that offense is defined by the statute.' " *Id.,* *quoting People v. Sullivan,* 173 N.Y. 122, 127, 65 N.E. 989, 989–990 (1903).[4] Although recognizing the state courts were not unanimous in this respect, the Supreme Court decided there was sufficient widespread acceptance of the two mental states of premeditation and felony-murder as alternative means of satisfying the *mens rea* element of the single crime of first-degree murder to persuade the Court that Arizona had not departed from the norm. 501 U.S. at 641, 111 S.Ct. at 2502.

¶ 29 Having made these determinations, the Court stated "[t]he question, rather, is whether felony murder may ever be treated as the equivalent of murder by deliberation, and in particular whether robbery murder as charged in this case may be treated as thus

equivalent." 501 U.S. at 644, 111 S.Ct. at 2503. The Supreme Court concluded:

> Whether or not everyone would agree that the mental state that precipitates death in the course of robbery is the moral equivalent of premeditation, it is clear that such equivalence could reasonably be found, which is enough to rule out the argument that this moral disparity bars treating . them as alternative means to satisfy the mental element of a single offense.

*Id.* at 501 U.S. at 644, 111 S.Ct. at 2503–4.

¶ 30 While recognizing that their "considerations [did not] exhaust the universe of those potentially relevant to judgments about the legitimacy of defining certain facts as mere means to the commission of one offense", the Supreme Court found the Arizona law "did not fall beyond the constitutional bounds of fundamental fairness and rationality." 501 U.S. at 645, 111 S.Ct. at 2504.

¶ 31 In the present case we are not concerned with the alternatives of premeditated and felony murder, but with those of child abuse murder by permitting child abuse and child abuse murder by the commission of child abuse. Appellant was charged under 21 O.S.1991, § 701.7(C) which provides:

> C. A person commits murder in the first degree when the death of a child results from the willful or malicious injuring, torturing, maiming or using of unreasonable force by said person or who shall willfully cause, procure or permit any of said acts to be done upon the child pursuant to Section 7115 of Title 10 of the Oklahoma Statutes. It is sufficient for the crime of murder in the first degree that the person either willfully tortured or used unreasonable force upon the child or maliciously injured or maimed the child.

¶ 32 This section of the first degree murder statute sets out different ways in which the offense of first degree murder by child abuse may be committed. It may be committed by the willful or malicious injuring, torturing, maiming, or using of unreasonable force by the defendant upon a child, or by

---

4. Also cited by the U.S. Supreme Court in support of this proposition of law is *James v. State,*  637 P.2d 862 (Okl.Cr.1981).

the defendant's willfully causing, procuring or permitting the acts of child abuse. This section specifically states that "a person commits murder in the first degree when the death of a child results ..." from either "willful or malicious injury" or "willfully permitting" those acts to be done. Therefore, under the statutory language the crime of first degree murder by child abuse is committed under either circumstance. This provision is not unlike the felony-murder provisions of section 701.7(B) which set forth alternative ways of committing felony-murder.

¶ 33 Appellant is correct in his argument that including the intent to commit child abuse into the first degree murder statute is a relatively recent enactment, *see Tucker v. State*, 675 P.2d 459, 461 (Okl.Cr.1984), and that the crime of child abuse murder by permitting child abuse did not exist prior to 1982. *See* 1982 Okla. Sess. Laws c. 279 § 1. However, the fact that the legal culpability of a defendant whose abuse of a child results in that child's death or who permits a child to be abused to the extent that death results has only recently been acknowledged by this State does not mean the Legislature cannot define first degree child abuse murder to have been committed either by the actual commission of the acts of abuse or by the willful permitting of the acts to abuse to occur. With the enactment of § 701.7(C) the Legislature has clearly stated its intention to punish as first degree murder the use of unreasonable force upon a child or the permitting of unreasonable force to be used upon a child when the death of a child results.

¶ 34 Having found the commission of child abuse and the permitting of child abuse to be alternative means to committing the crime of first degree murder by child abuse, "[t]he constitutional requirement of a unanimous jury verdict applies only to the ultimate issue of the appellant's guilt or innocence of the crime charged, not the alternative means by which the crime was committed." *Rounds v. State*, 679 P.2d 283, 287 (Okl.Cr.1984). In *Powell v. State*, 906 P.2d 765, 775–76 (Okl.Cr. 1995), this Court stated:

[T]his Court has reaffirmed its prior holdings that failure of a jury to indicate the basis of their finding of guilt was not error where there was but a single crime charged, i.e. first degree murder. "Whether or not [murder] was committed with malice aforethought, or during the commission of a felony goes to the factual basis of the crime." When the jury verdict is unanimous that a defendant committed murder in the first degree, such a verdict satisfies due process. Further, there is no due process violation when all of the elements of the crime charged were proven. (citations omitted).

*See also Neill v. State*, 896 P.2d 537, 552–53 (Okl.Cr.1994), *cert. denied*, 516 U.S. 1080, 116 S.Ct. 791, 133 L.Ed.2d 740 (1996); *Crawford v. State*, 840 P.2d 627, 640 (Okl.Cr.1992); *Newsted v. State*, 720 P.2d 734, 737–38 (Okl. Cr.), *cert. denied*, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986); *James v. State*, 637 P.2d 862, 865 (Okl.Cr.1981).

¶ 35 The evidence in the present case showed a *prima facie* case was made and all of the elements were proven to support a finding of guilt as to either child abuse murder by the commission of child abuse or child abuse murder by permitting child abuse. The evidence supporting the conclusion that Appellant was the perpetrator of the abuse inflicted upon Shane came from the other Coffman children who testified that both Appellant and their mother beat Shane the day of the murder, carried him to the bathtub, and stayed with him in the bathroom while he cried and screamed. Supporting evidence can also be found in Coffman's statement that she saw Appellant coming out of the bathroom and then found Shane in the bathroom not breathing.

¶ 36 Evidence supporting a conclusion that Appellant permitted the abuse comes from Coffman's statement that she was in the bathroom struggling with Shane when the shower doors fell down. Appellant entered the bathroom, not once but twice to attend to the shower doors. Appellant's own statement supports the conclusion that he was aware that Coffman was abusing Shane in the bathroom.

¶ 37 The jury's verdict of guilt indicating it was divided as to the underlying theory was a disagreement as to the factual basis of the offense and as to the manner in which the crime was committed. As the Supreme Court stated in *Schad*:

> We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone. In these cases, as in litigation generally, "different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." (citation omitted).

*Id.* at 501 U.S. at 631–32, 111 S.Ct. at 2497.

¶ 38 Here, there was a single crime charged—first degree murder by child abuse. Whether or not it was committed through the commission of child abuse or through the permitting of child abuse goes to the factual basis of the crime. The jury verdict was unanimous that Appellant committed the crime. Such a verdict satisfies due process. *See Plunkett v. State*, 719 P.2d 834, 841 (Okl.Cr.), *cert. denied*, 479 U.S. 1019, 107 S.Ct. 675, 93 L.Ed.2d 725 (1986).

¶ 39 The enactment of § 701.7(C), a separate provision within the first degree murder statute to address the death of a child as a result of child abuse, is indicative of the Legislature's intent within the last two decades to draft legislation aimed specifically at the protection and welfare of children. *See* 10 O.S.Supp.1993, § 401 *et. seq.* (Oklahoma Child Care Facilities Licensing Act); 10 O.S. Supp.1995, § 7001–1.1 *et. seq.* (the Oklahoma Children's Code); and, 10 O.S.Supp.1995, § 7101 *et. seq.* (Oklahoma Child Abuse Reporting and Prevention Act). Although specifically directed at situations where child abuse has resulted in death, by enacting 21 O.S.1991, § 701.7(C) the Legislature has merely created another way of committing first degree murder.

¶ 40 The language of the statute, setting forth alternative means of committing the crime of child abuse murder, makes it analogous to the crime of felony-murder. Under 21 O.S.1991, § 701.7(B) felony-murder is committed when a death results from a defendant's commission of any of several specifically listed underlying felonies. In a felony-murder prosecution, proof of the underlying felony is needed to prove the intent necessary for a felony murder conviction. *Fields v. State*, 923 P.2d 624, 634 (Okl.Cr. 1996), *cert. denied*, 520 U.S. 1216, 117 S.Ct. 1704, 137 L.Ed.2d 829 (1997). Further, when the crime is charged in the alternative, with more than one felony charged as the underlying felony, a constitutionally unanimous verdict is required only with respect to the ultimate issue of the defendant's guilt or innocence of the crime charged and not with respect to alternative means by which the crime was committed. *Blackwell v. State*, 663 P.2d 12, 16 (Okl.Cr.1983).

¶ 41 We find the child abuse murder statute should be interpreted in the same manner as § 701.7(B). Proof of the underlying act of child abuse is needed to prove the intent necessary for a child abuse murder conviction. *See Fairchild v. State*, 998 P.2d 611, 618–19 (Okl.Cr.1999) (holding crime of first degree murder by child abuse is a general intent crime). A constitutionally unanimous verdict is required only with respect to the ultimate issue of the defendant's guilt or innocence of the crime charged and not with respect to alternative means by which the crime was committed.

¶ 42 Additionally, we review the verdicts in this case in light of our constitutional and statutory provisions on verdict forms. As previously noted, a unanimous verdict is guaranteed by this State's Constitution. Okla. Const., art. 2, § 19. Article 7, § 15 of the Oklahoma Constitution provides that all verdicts shall be general verdicts. Article 7, § 15 provides:

> In all jury trials the jury shall return a general verdict, and no law in force nor any law hereafter enacted, shall require the court to direct the jury to make findings of particular questions of fact, but the court may, in its discretion, direct such special findings.

¶ 43 This Court has held that the general verdict that is required under the Oklahoma Constitution for jury trials must be wholly determinative of the guilt or innocence of a defendant. *Romano v. State*, 909 P.2d 92, 125 (Okl.Cr.1995), *cert. denied*, 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996); *Romano v. State*, 847 P.2d 368, 384-5 (Okl.Cr. 1993), *affirmed, Romano v. Oklahoma*, 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). This interpretation was found consistent with the legislative definition of the form of verdict in criminal cases set forth at 22 O.S.1991, § 914, which states "[a] general verdict upon a plea of not guilty, is either 'guilty', or 'not guilty', which imports a conviction or acquittal of the offense charged." *Romano*, 847 P.2d at 385. In the present case, the jury's verdict was determinative of Appellant's guilt and the jury was aware of the effect of its guilty verdict. The interrogatories included on the verdict were not the type of special findings prohibited by § 15.

¶ 44 However, the verdicts in this case do not conform to the forms of verdict set out in OUJI–CR (2d) 4-67. In adopting OUJI–CR (2d) this Court, pursuant to 12 O.S.1991, § 577.2, has directed the instructions and verdict forms contained in OUJI–CR (2d) are to be used unless there is legal authority for modification, and in that case the authority should be set out in the record. That was not done in this case, therefore, the trial court's modification of the verdict forms was error. However, based upon the above analysis, the error was harmless. Trial courts are once again admonished to utilize the uniform instructions and verdict forms contained in OUJI–CR (2d). Accordingly, this assignment of error is denied.

### B.

¶ 45 In his fourth assignment of error, Appellant contends the trial court erred in joining the child abuse counts and the murder count in the same trial. Appellant's pre-trial objection to the joinder has preserved the issue for appellate review.

¶ 46 Joinder of offenses is permitted pursuant to 22 O.S.1991, § 438. This section provides that multiple offenses may be combined for trial "if the offenses . . . could have been joined in a single indictment or information." This Court has allowed joinder of separately punishable offenses allegedly committed by the accused if the separate offenses "arise out of one criminal act or transaction, or are part of a series of criminal acts or transactions." *Glass v. State*, 701 P.2d 765, 768 (Okl.Cr.1985). "Further, with respect to a series of criminal acts or transactions, 'joinder of offenses is proper where the counts so joined refer to the same type of offenses occurring over a relatively short period of time, in approximately the same location, and proof as to each transaction overlaps so as to evidence a common scheme or plan.'" *Cummings v. State*, 968 P.2d 821, 829 (Okl.Cr.1998), *cert. denied*, 526 U.S. 1162, 119 S.Ct. 2054, 144 L.Ed.2d 220 (1999). In *Plunkett*, 719 P.2d at 838, this Court defined "transaction" as:

"'Transaction' is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *United States v. Park*, 531 F.2d 754, 761 (5th Cir.1976).

¶ 47 Appellant argues the instances of child abuse and the allegation of child abuse murder did not arise out of a single transaction nor did they constitute a series of transactions as they were alleged to have occurred over a time span of eight months. He further argues the counts did not constitute a common scheme or plan nor was a logical relationship established among the counts as the evidence and proof of each offense did not overlap and there was no proof that any of the offenses either depended upon or facilitated any of the other offenses.

¶ 48 We disagree with Appellant's view of the evidence. The abuse of Shane which resulted in his death occurred during the same time period as the abuse of the other children. Although some of the abuse was alleged to have occurred after Shane died, as we stated earlier the abuse is viewed as a continuing transaction. Further, the evidence supporting each count overlapped to show a common scheme or plan of repeatedly abusing the children, which in one instance

resulted in the death of one of the children. While a time span of eight months is not the relatively short period of time discussed in our prior case law, the crimes in this case occurred at the same location and the victims and witnesses were the same. This evidence shows a logical relationship between the offenses which warranted a joint trial. Therefore, joinder was permissible under § 438.

¶ 49 Appellant next argues that even if joinder was statutorily permissible, the trial court abused it discretion in failing to sever the counts. He claims prejudice is evident by the imposition of the maximum sentence for each offense and by the jury's use of the evidence of one crime to support the conviction for another. Title 22 O.S.1991, § 439 provides for severance of offenses when either the prosecution or the defense appears to be prejudiced. The decision to grant or deny severance is left to the sound discretion of the trial court. *Neill v. State*, 827 P.2d 884, 886 (Okl.Cr.1992). Absent an abuse of discretion resulting in prejudice to the appellant, the decision of the trial court will not be disturbed on appeal. *Id.* Appellant has burden of showing how he was prejudiced by the joint trial. *See Hightower v. State*, 672 P.2d 671, 677 (Okl.Cr.1983). Appellant has failed to meet his burden in the present case.

¶ 50 Evidence of the other offenses would have been permissible pursuant to 12 O.S. 1991, § 2404(B) to prove identity, common scheme or plan, and absence of mistake or accident. Accordingly, we cannot find that the joinder of offenses severely prejudiced Appellant's right to a fair trial. This proposition is denied.

### C.

¶ 51 In his fifth assignment of error, Appellant asserts he was denied a fair trial by suggestive interviewing techniques used on the children and by the trial court's failure to admit the testimony of Dr. Wanda Draper. Initially, Appellant argues that two years prior to trial, he filed a Motion to Dismiss all counts of child abuse as improper interviewing techniques had led to the destruction of evidence. In a pre-trial hearing, the defense argued Appellant's due process rights were compromised by the failure of the State to video-tape the interviews with the children thus failing to preserve critical testimonial evidence and by the tampering with the children's testimonial evidence through suggestive interview techniques.

¶ 52 In *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), the Supreme Court addressed the destruction and failure to preserve potentially exculpatory physical evidence. The Supreme Court distinguished between evidence that was material to the case and fell under the principles of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and evidence which was only potentially exculpatory as addressed in *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). The Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* 488 U.S. at 58, 109 S.Ct. at 337. This Court adopted the *Youngblood* standard in *Hogan v. State*, 877 P.2d 1157, 1161 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1174, 115 S.Ct. 1154, 130 L.Ed.2d 1111 (1995).

¶ 53 In the present case, Appellant argues bad faith is evident from the State's failure to tape the children's interviews. He contends the "fact of the children's changing stories alone was sufficient to put the State on notice that these statements would have been helpful to the defense". Appellant argues that also lost in the failure to tape the interviews was evidence of the interviewing techniques employed by the various interviewers.

¶ 54 The record reflects the children were first interviewed February 11, 1996, at approximately 2:00 a.m. in the emergency room of Children's Hospital. The interviews were conducted by the examining physician, Dr. Arambula, and were made for medical purposes. At approximately the same time, representatives of the Department of Human Services, Kimberly McCune and Cheryl Coponiti, also interviewed the children. Ms. Coponiti explained at the preliminary hearing that those interviews were not taped because it was the early morning hours and

taping equipment was not available. Summaries of both McCune's and Coponiti's interviews with the children were provided to defense counsel.

¶ 55 Another interview was conducted by Neil Hamilton and Cliff Winkler, investigators for the District Attorney's Office, later in the day on February 11, 1996. This interview was tape-recorded and provided to the defense. Examination by the prosecutor, Ms. Cliff, at the preliminary hearing was preserved by court record for use by the defense.

¶ 56 Appellant argues that by July 1996, "no less than seventeen different people had interviewed the Coffman children, of which seven were direct employees of the Cleveland County District Attorney's Office." Appellant's source for this information is the defense Motion to Dismiss filed before trial. In the motion, the defense lists the seventeen people who it claimed had interviewed the children, either formally or informally. However, other than the interviews specified above, and testimony that the children continued to see Ms. Coponiti and their therapists during the pendency of the case, the record is void of any other interviews conducted with the children.

¶ 57 While taping interviews with child victims might be the optimum way of preserving those interviews, the failure to video or audio tape does not always indicate a failure to preserve potentially useful evidence. We are not going to mandate that every interview conducted with a child victim be taped because it may potentially be exculpatory. Here, written summaries or copies of actual interviews were provided to the defense. The defense was able to fully cross-examine the two witnesses (Neil Hamilton and Dr. Martha Arambula) who testified at trial to interviewing the children. Appellant's claim that the State did not tape the interviews because it did not want to expose improper interview techniques is mere speculation and has no support in the record. Accordingly, we find Appellant has failed to show the State acted in bad faith in failing to tape all of the children's interviews.

¶ 58 Appellant further contends the trial court erred in overruling his objection to the children's competency to testify. An *in-camera* hearing regarding this issue was held prior to trial wherein the defense presented the testimony of Dr. Wanda Draper regarding her opinions as to the competency of each child to testify before the court. The trial judge reserved ruling on the issue until he conducted *voir dire* on the children prior to calling them to the witness stand. The court indicated it would take into consideration Dr. Draper's opinion in making its ruling. *Voir dire* was conducted on each of the children individually and *in-camera*. After hearing argument from both sides, the trial court ruled that under 12 O.S.1991, §§ 2601, 2602, and 2603, each of the children was competent to testify. The court stated that each child indicated a personal knowledge of the facts and circumstances of the case; they understood the importance of telling the truth and they understood what it meant to take an oath. The court also noted that certain concerns raised by the defense, *i.e.*, the children had admitted to lying, their memories of the events were not always consistent, etc., were issues which went to the children's credibility and could be addressed on cross-examination.

¶ 59 We find the record supports the trial court's ruling. Under 12 O.S.1991, § 2601, all persons are presumed competent to testify. A child is a competent witness under 12 O.S.1991, § 2603, if he or she can distinguish truth from fiction, has taken an oath, and demonstrated that he or she has personal knowledge of the crime. *Hawkins v. State*, 891 P.2d 586, 594 (Okl.Cr.1994), *cert. denied*, 516 U.S. 977, 116 S.Ct. 480, 133 L.Ed.2d 408 (1995); *Dunham v. State*, 762 P.2d 969, 972 (Okl.Cr.1988). Determination of a witness' competency to testify is a matter of discretion for the trial judge and that determination will not be disturbed unless the party asserting error shows a clear abuse of discretion. *Dunham*, 762 P.2d at 972.

¶ 60 The record shows that each of the children indicated they could distinguish between the truth and a lie. Each child indicated an understanding of what it meant to take an oath to tell the truth, and each child certainly demonstrated that he or she had personal knowledge of the facts of the

case. Appellant makes much of the fact that the childrens' stories changed over time and that the children admitted they lied. The record shows the childrens' statements varied in certain respects over time. However, Appellant has failed to show this was the result of improper interview techniques or that it impacted one of the three factors listed in § 2603. The children did admit that during their lifetimes they had in certain situations told lies, but they each testified they would not lie on the witness stand. Regardless, any conflict or inconsistency in a witness' testimony goes to the weight and credibility of that testimony, not the competency of the witness to testify, and are issues properly addressed on cross-examination. *Gray v. State,* 650 P.2d 880, 885 (Okl.Cr. 1982). Accordingly, we find the trial court did not abuse its discretion in ruling the children were competent to testify.

¶ 61 Appellant next argues the trial court erred in excluding the trial testimony of Dr. Draper. After hearing *in-camera* testimony from Dr. Draper, the trial court found the testimony "does not meet the *Daubert* standards to qualify as expert direct testimony regarding credibility. The credibility, again, is a matter for the finder of fact." The trial court did allow the defense the opportunity to have Dr. Draper serve as "expert advisory counsel" and remain in the courtroom during the children's testimony to advise the defense as to areas of possible cross-examination and closing argument. Further, prior to closing their case-in-chief, defense counsel renewed the request to call Dr. Draper to the stand. The court denied the request, but accepted Dr. Draper's *in-camera* testimony as an offer of proof.

¶ 62 The admission of expert testimony is governed generally by 12 O.S.1991, § 2702. In areas of novel scientific evidence, this Court has adopted the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See Taylor v. State,* 889 P.2d 319, 328 (Okl.Cr.1995). In *Daubert,* the Supreme Court stated that such expert testimony is admissible only if it is both relevant and reliable. *Daubert,* 509 U.S. at 597, 113 S.Ct. at 2799. This inquiry into reliability and relevance is two-fold. The reliability prong requires the expert opinion testimony be about "scientific knowledge". *Taylor,* 889 P.2d at 329. The relevance prong involves the requirement that the proffered testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* at 330.

¶ 63 Appellant argues Dr. Draper's testimony "undoubtedly involved 'scientific knowledge' ", and that the relevant question here is whether Dr. Draper's testimony would have assisted the trier of fact. While we appreciate Appellant's offer to reduce our work by focusing on only one prong of the *Daubert* analysis, we find it necessary to review both prongs of the analysis in order to properly evaluate the trial court's ruling and resolve Appellant's allegation of error.

¶ 64 In *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 238 (1999), the Supreme Court extended *Daubert* to testimony based on "technical" and "other specialized" knowledge. The Court stated whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine. 526 U.S. at 152, 119 S.Ct. at 1176.

¶ 65 Reviewing the record under the criteria set forth in *Daubert* and *Kumho* we find Dr. Draper's qualifications as an expert do not seem to be in doubt. She testified to having a Ph.D. in Child Development and working and teaching in the field of child development for approximately twenty years. She also stated that during the previous ten years she had participated in a hands-on program which worked directly with abused and neglected children. The trial court seems to have excluded her testimony based upon her theory that the children were not competent to testify, and not upon her lack of qualifications.

¶ 66 Dr. Draper testified generally to factors to be considered in determining whether a child could be a competent witness including capacity and ability to observe, intelligence, memory, ability to communicate. When asked whether "it would be correct to

say that failing to properly interview or elicit information from a child can taint or impact their ability to then accurately relate an event?", she answered "[t]hat's a very great possibility, yes." Dr. Draper then addressed the Coffman children specifically. Dr. Draper stated she interviewed each of the Coffman children individually and studied material from the court proceedings and DHS. She gave her conclusion as to whether each of the Coffman children was competent to testify. She generally concluded that based upon the children's life history of trauma, abuse and neglect, and the effect that has on memory and ability to recall, combined with the death of their brother Shane, and the numerous interviews conducted in connection with the court proceedings, none of the Coffman children were competent to testify at trial.

¶ 67 A review of the record shows there was no testimony regarding whether Dr. Draper's theory of the effect of trauma on the child's ability to be a competent witness has been or can be tested. There was no showing of its general acceptance in the field of child development. Further, Dr. Draper testified only as to a "great possibility" that improper interview techniques could impact a child's ability to relate an event. Dr. Draper interviewed each of the children only once, just prior to trial, and asked each of them five or six uniform questions. She testified she had no knowledge of whether the statements the children made concerning the facts of the case were embellished or false. She also stated that piecemeal disclosure of the facts is common among child abuse victims.

¶ 68 Having thoroughly reviewed the record, we find the trial court did not abuse its discretion in excluding the testimony.[5] Dr. Draper's testimony did not meet the *Daubert* requirements of "scientific knowledge" and the testimony would not have assisted the trier of fact. Once the trial court determined the children were competent witnesses, Dr. Draper's testimony would have been confusing and its speculative nature would not have been relevant to the jury's determination of the credibility of children's testimony. Accordingly, we find the testimo-

ny was properly excluded. This assignment of error is denied.

### D.

¶ 69 In his sixth assignment of error, Appellant contends the trial court erred in excluding the testimony of defense witness Deborah Maddox. Ms. Maddox was Appellant's first attorney. Shortly after their arrest, Appellant and Bertha Jean Coffman entered into a joint defense agreement wherein their appointed counsel would work together to build a united defense against the State's charges. Approximately seventeen months later in July 1997, Coffman, represented by Robert Perrine, moved to sever her trial from Appellant's. The motion was granted, and on August 20, 1997, Coffman entered blind pleas to the charges against her. The pleas were accepted by the court, but sentencing was delayed. In September, 1997, Ms. Maddox filed a motion to withdraw as Appellant's counsel based upon the conflict of interest she would face if placed in the position of attacking Coffman's credibility as a witness if she testified in Appellant's trial. The State filed a similar motion to have Ms. Maddox removed as Appellant's counsel. The trial court allowed Ms. Maddox to withdraw as counsel, and new counsel was appointed for Appellant.

¶ 70 Coffman had not been sentenced on her guilty pleas at the time she testified in Appellant's case on April 6–7, 1998. At the close of its case-in-chief, the defense sought to call Ms. Maddox to the stand. Counsel informed the court that Maddox had been privy to information given by Coffman "implicating her [Coffman's] responsibility in killing her son and exculpating Don Gilson, ..." The State objected to Maddox's testimony arguing it would reveal information protected by the attorney-client privilege and was therefore inadmissible. The trial court prohibited the offered testimony, finding the communications between Coffman and Ms. Maddox were made at the time the joint defense effort was underway and were therefore protected by the attorney-client privi-

---

5. We review based upon an abuse of discretion as set forth in *Kumho* and do not conduct a *de* *novo* review as in *Taylor*. *See Kumho*, 526 U.S. at 158, 119 S.Ct. at 1179.

lege. Now on appeal, Appellant assumes, without conceding, that Coffman properly invoked her attorney-client privilege with Ms. Maddox. However, he argues that any privilege was waived when Coffman took the stand to testify about a subject matter that was or would naturally be communicated to her attorney.

¶ 71 The parameters of a joint defense agreement or a joint defense privilege have not been determined in this state, and this opinion does not attempt to do so now. We only address the issue as raised by Appellant. We presume Coffman's communications with Ms. Maddox were privileged during the joint defense effort and we now look at whether she waived that privilege. Appellant relies on one case from this court and seven cases from other jurisdictions which discuss when a waiver of the attorney-client privilege is implied. Relying on *Lawson v. State,* 492 P.2d 1113, 1117 (Okl.Cr.1971), Appellant contends that a "classic case of waiver analogous to the one urged here is where one challenges the competence of his attorney; there the privilege is waived insofar as disclosure is necessary to defend against the allegations." In *Lawson,* this Court stated "[w]e are of the opinion that the defendant's attack of the professional confidence of his attorney, Mr. John Tanner, waived any claim he might have to confidential communications between an attorney and client relevant to that issue." In arriving at this conclusion, the Court noted that the rule that a client waives his privilege by attacking the attorney's performance of his duties was a well settled question among the courts. *Id.* In the present case, no such attack on counsel has been made. Further, unlike *Lawson,* the issues here can be resolved without exposing confidential communications. Therefore we find Appellant's reliance on *Lawson* misplaced.

¶ 72 The other cases cited by Appellant set forth the rule that courts will imply a waiver of the attorney-client privilege when:

1) the party asserting the privilege does so as a result of an affirmative act; 2) through the affirmative act the privilege holder has made the substance of the confidential communications a material issue in the case; and 3) use of the privilege to suppress privileged information needed to address the material issue brought out by the holder would be manifestly unfair to the party against whom it is asserted.[6]

¶ 73 An affirmative act as discussed in the cases cited by Appellant include filing suit, raising an ineffective assistance of counsel claim, or asserting a claim that put counsel's advice in issue. None of these events occurred here. Coffman was called to testify as a witness for the State. Her communications with Ms. Maddox were privileged. 12 O.S.1991, § 2502. The record indicates the testimony sought from Ms. Maddox was evidence that had not been previously stated or testified to by Coffman. Therefore, Coffman's act of testifying for the State concerning certain aspects of the crime did not waive the attorney-client privilege as to any other aspects of the crime.

¶ 74 Appellant further argues any valid privilege must give way to his due process rights. He contends that under the circumstances of this case, Coffman's interest in asserting her attorney-client privilege was *de minimus* as compared to his need to defend against the death penalty.

¶ 75 "The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. U.S.,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981) *citing* 8 J. Wigmore, Evidence § 2290 (McNaughton rev.1961). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* In situations where such a privilege could be abused, the privilege does not exist. *See* 12 O.S.1991, § 2502(D)(1) (no privilege exists if the ser-

---

6. *United States v. Amlani,* 169 F.3d 1189, 1195 (9th Cir.1999); *Conkling v. Turner,* 883 F.2d 431, 433–435 (5th Cir.1989); *Sedco International S.A. v. Cory,* 683 F.2d 1201, 1206 (8th Cir.1982); *State v. von Bulow,* 475 A.2d 995, 1007 (R.I. 1984); *Wender v. United Services Automobile Ass'n,* 434 A.2d 1372, 1374–5 (D.C.1981); *United States v. Aronoff,* 466 F.Supp. 855, 862–863 (S.D.N.Y.1979); *Goldman Sachs & Co. v. Blondis,* 412 F.Supp. 286, 288 (N.D.Ill.1976).

vices of the attorney were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud); Rule 1.6(b), *Oklahoma Rules of Professional Conduct*, 5 O.S.1991, Ch. 1 App. 3–A (lawyer may disclose intention of client to commit a crime). No evidence of such abuse is present here.

¶ 76 Further, "the right to compulsory process does not negate traditional testimonial privileges such as the attorney-client privilege." *Cooper v. State*, 661 P.2d 905, 907 (Okl.Cr.1983), *citing Washington v. State of Texas*, 388 U.S. 14, 23, 87 S.Ct. 1920, 1925, 18 L.Ed.2d 1019 n. 21 (1967). Appellant has failed to persuade us that his case presents such unique circumstances as to warrant limiting this well established privilege. The attorney-client privilege is not an arbitrary rule to be applied according to varying facts and circumstances. Here, the record shows Appellant was able to fully defend against the State's accusations. He extensively cross-examined Coffman on her version of events and any inconsistencies in her statements. There is no indication that Coffman committed perjury while testifying. Based upon this record, Appellant has failed to prove that Coffman's exercise of her attorney-client privilege deprived him of his rights to due process and confrontation of witnesses. Therefore, we find the trial court did not err in excluding the testimony of Ms. Maddox. This assignment of error is denied.

### E.

¶ 77 In his eighth assignment of error Appellant challenges the sufficiency of the evidence supporting the convictions for both murder and child abuse. As this case presents both direct and circumstantial evidence, we will review it in the light most favorable to the State to determine whether any rational trier of fact could find the elements of the crime charged beyond a reasonable doubt. *Spuehler v. State*, 709 P.2d 202, 203–04 (Okl.Cr.1985).[7] Although there may

be conflicts in the evidence and different inferences drawn therefrom, if there is competent evidence to support the verdict, we will not interfere on appeal. *Montgomery v. State*, 502 P.2d 353, 355 (Okl.Cr.1972). It is the exclusive province of the trier of fact to weigh the evidence and determine the facts. *Id.*

¶ 78 Appellant contends that as to the murder conviction, the State could not show with any precision how the victim died, much less that his life ended as a result of Appellant's criminal conduct. The elements of first degree child abuse murder by the commission of child abuse are:

*First*, the death of a child under the age of eighteen;

*Second*, the death resulted from the willful or malicious injuring, torturing, or using of unreasonable force;

*Third*, by the defendant and/or another engaged with the defendant.

*See* 21 O.S.1991, § 701.7(C). These elements were given to the jury in Instruction No. 6. The language is verbatim OUJI–CR (2d) 4–65A. Further, the term "willful" was defined for the jury as follows:

Purposeful. 'Wilfull' is a willingness to commit the act or omission referred to, but does not require any intent to violate the law, or to acquire any advantage.

In *Fairchild*, 998 P.2d at 622–23, we stated the crime of first degree murder by child abuse was a general intent crime which does not require a specific intent to injure, but only a general intent, included in the term willfully, to commit the act which causes the injury.

¶ 79 As the victim's body was not discovered until approximately six (6) months after death, the medical examiner could not testify with certainty as to the cause of death. However, he did testify to certain injuries visible to the remaining bones (fractures to the skull, jaw, collarbone, shoulders, ribs, legs and vertebrae) which indicated the infliction of serious physical abuse less than a

7. I continue to urge this Court to adopt a unified *Spuehler*-type approach to evaluating the sufficiency of the evidence in all cases, whether they contain both direct and circumstantial evidence, or whether they contain entirely circumstantial evidence. *See White v. State*, 900 P.2d 982, 993–95 (Okl.Cr.1995) (Lumpkin,J., specially concurring).

week before the victim's death. The testimonial evidence at trial showed Appellant purposefully and intentionally injured and used unreasonable force on the victim on the day of his death to the extent that death resulted. Appellant's beating of the victim prior to placing him in the bathtub, remaining in the bathroom while the victim screamed and cried and his exit from the bathroom shortly before the victim was found dead, is sufficient, when viewed in the light most favorable to the State, to support a finding that Appellant committed first degree murder by the commission of child abuse.

¶ 80 Appellant was also charged under 10 O.S.1991, § 7115, with injury to a minor child or child abuse perpetrated upon the other Coffman children. The elements of the offense are:

First, willful/malicious;

Second, causing;

Third, injury, torture, or use of unreasonable force;

Fourth, upon a child under the age of eighteen.

See 10 O.S.1991, § 7115. These elements were given to the jury in Instruction No. 15. The language is taken directly from OUJI–CR (2d) 4–35.

¶ 81 The evidence is sufficient to support a finding that Appellant physically abused Isaac and Tia. Isaac testified Appellant was nice towards the children when he first started coming to his mother's trailer. However, once they moved into his trailer, he became mean and whipped and hit the children. Isaac said he was beaten with a wooden paddle, placed in the bathtub with his hands tied, forced to stand at the wall, and hit with a board while standing at the wall. Sometimes he was forced to stand at the wall all day. He said he even fell asleep once while standing at the wall. Isaac said he was hit on the bottom, the back of the legs, the back and on top of his head. Sometimes when he was forced to sit in the bathtub he would be hit with a wooden board. He further stated Appellant would stick his (Isaac's) head between the wall and the refrigerator and smash his head against the wall. Forensic investigation into Appellant's trailer showed traces of Isaac's blood in several places throughout the trailer—on the walls, legs to an ironing board, etc.

¶ 82 At other times, Isaac was denied food. Tranny testified to secretly taking Isaac food when Isaac had been confined to the bathtub for the day. Tranny also testified that Isaac and Tia were not fed regularly and had to specifically ask for food. Tranny and Tia both testified that Appellant hit Isaac with a board on the back of his legs and on his head, and with a rod from the closet. At the close of his direct examination, Isaac was asked about Appellant's dogs and how Appellant treated his dogs. Isaac said Appellant fed his dogs and took care of them, that he treated his dogs better than he treated Isaac and his brothers and sisters.

¶ 83 Isaac also testified that Tia was made to stand at the wall and that she was hit with a board. Tia testified that Appellant whipped her with a board and tied her hands with a rope. She said Appellant repeatedly hit her on the sore on her bottom. She said he also put her in the bathroom on the floor or in the bathtub as punishment, sometimes leaving her there for hours. Tia also said she would have to ask Appellant for permission to eat. Tia stated that Appellant stomped on her right foot until it bled. Tranny testified that he saw Appellant, more than once while wearing his boots, stomp on Tia's feet until they bled. Bertha Jean Coffman also testified to observing Appellant beat Isaac and Tia with a variety of implements.

¶ 84 The record shows the children never received any medical treatment for their injuries. The physical examinations of the children conducted at Children's Hospital February 16, 1996, showed injuries which were not the result of normal childhood play, but were consistent with repeated blunt force trauma. This evidence is sufficient to support Appellant's conviction for abusing Isaac and Tia.

¶ 85 While no one but Shane, Appellant, and Coffman knew exactly what happened inside that bathroom February 16, 1996, the evidence is sufficient to support a finding that if Appellant did not deliver the abusive blows, he allowed Coffman to do so.

As to the offense of first degree murder by child abuse by permitting child abuse, the jury was instructed in Instruction No. 6 as follows:

No person may be convicted of murder in the first degree unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:

*First,* the death of a child under the age of eighteen;

*Second,* the death resulted from the willful or malicious injuring, torturing, or using of unreasonable force;

*Third,* which was knowingly permitted

*Fourth,* by a person responsible for the child's health or welfare.

As to the offense of permitting child abuse, Instruction No. 16 stated:

No person may be convicted of permitting the beating or injuring of a child unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:

*First,* a person responsible for a child's health or welfare;

*Second,* knowingly;

*Third,* permitted;

*Fourth,* injury, torture, or use of unreasonable force;

*Fifth,* upon a child under the age of eighteen.

¶ 86 Based upon these statutory elements, to support a conviction for permitting child abuse for purposes of either the first degree murder charge or the child abuse charges, the State had to prove Bertha Jean Coffman abused her children and that Appellant permitted or allowed that abuse to occur. As to evidence showing Coffman participated in the abuse of Shane which led to his death, Tranny testified that both his mother and Appellant took Shane outside the morning of his death. Although Tranny could not testify as to exactly what happened outside, as he remained inside the trailer, he said both adults remained outside with Shane. He said the children inside the trailer heard Shane scream. He further stated that Appellant and Coffman brought Shane back inside the trailer and both of them carried him to the bathroom. He said they both remained in the bathroom with Shane. Both Appellant and Coffman admitted that Coffman remained in the bathroom with Shane for a period of time. Coffman testified she struggled with Shane on at least two occasions. Appellant stated Coffman was the last one with the victim prior to his death. From this evidence, the jury could infer that Coffman physically abused Shane.

¶ 87 As to evidence that Coffman abused Isaac and Tia, testimonial and physical evidence showed both were severely malnourished and never received any medical treatment for their injuries and wounds. The State presented evidence as to the unsanitary conditions of Coffman's trailer and Coffman's neglect of the children. However, this occurred prior to the date of the charges in the instant case. Isaac, Tia and Tranny testified to beatings received from their mother once they moved into Appellant's trailer. Tia testified that she and Isaac were told by Coffman they would have to ask Appellant's permission to eat. Tia also testified that once she was taking a bath, Coffman noticed an open wound on her bottom and poured salt into the bathwater. Tia testified the salt burned. Tia also testified Coffman saw the sore on her foot but never put any medicine on it. This evidence supports a finding that Coffman abused her children.

¶ 88 However, these findings that Coffman abused her children does not end our analysis. The State also had to prove that Appellant knowingly permitted Coffman's abuse. Permitting as used in the child abuse and first degree murder by child abuse statutes is defined in § 7115 as follows:

As used in this section, "permit" means to authorize or allow for the care of a child by an individual when the person authorizing or allowing such care knows or reasonably should know that the child will be placed at risk of abuse as proscribed by this section.

This definition was given to the jury in Instruction No. 17. "Knowingly" was also defined for the jury as "with personal awareness of the facts."

¶ 89 Testimony that both Appellant and Coffman were with Shane, first outside the trailer and then inside the bathroom, and

Appellant's active participation in the events of that day support a finding that any abuse Coffman inflicted upon Shane, Appellant had personal first-hand knowledge of and allowed to occur. Most of the abuse inflicted upon Isaac and Tia by Coffman was committed in Appellant's presence with his knowledge. The children's appearance and conduct showed they were not fed regularly to the point of malnourishment. Further, evidence showed that many of the beatings received by the children from Coffman were the result of the children breaking one of Appellant's rules. Evidence of Coffman's abuse of the children, Appellant's knowledge of that abuse and his failure to prevent the abuse from continuing constitute sufficient evidence to support a finding that he permitted the abuse inflicted upon Shane, Isaac and Tia. Accordingly, we find the evidence sufficient to support the convictions for first degree murder by child abuse and child abuse beyond a reasonable doubt.

### F.

¶ 90 Appellant contends in his tenth assignment of error that the statutes proscribing first degree murder by child abuse, 21 O.S.1991, § 701.7(C) and child abuse, 10 O.S.Supp.1996, § 7115 are unconstitutionally vague. He asserts the meaning of the term "unreasonable force" as used in both statutes is not clear and that persons of ordinary intelligence will almost always disagree on what constitutes ordinary and unreasonable force. Appellant asks us to reconsider our holding in *Drew v. State,* 771 P.2d 224, 228 (Okl.Cr.1989) wherein we found the term "unreasonable force" as used in § 701.7(C) was not unconstitutionally vague. We are not persuaded to revisit the issue.

¶ 91 Appellant next contends the permitting portion of the statute also contains unconstitutionally vague terms. He argues the term "permit" fails to make clear at what point a person has "authorized" or "allowed" another to commit abuse. Appellant also argues that in making one accountable if he "knows or reasonably should know", the statute fails to give any direction as to what facts make one "reasonably" aware of any risk involved. To support his arguments, Appel-

lant presents us several hypotheticals concerning individuals situated in different relationships to children wherein he asserts the line between what is legal and what is not legal is blurred.

¶ 92 "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). "It is fundamental that statutes creating criminal offenses must be drawn in language sufficient to apprise the public of exactly what conduct is forbidden. A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Hayes v. Municipal Court of Oklahoma City,* 487 P.2d 974, 976 (Okl.Cr.1971) *quoting Connally v. General Construction Company,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).

¶ 93 The terms "authorize", "allow", "know or reasonably should know" are terms of common usage. Reading these terms in context of the entire statute, it is apparent that §§ 701.7(C) and 7115 are written in language sufficient to apprise the public of exactly what conduct is forbidden and people of common intelligence would understand the meaning of the statutes. Further, the language of the statutes, as applied to Appellant, is not vague but clearly points out the appropriateness of the language used by the Legislature. Here, Appellant resided with the children and his relationship with the children was viewed as that of a parent. The abuse occurred in his presence and was the type of conduct which leaves no doubt that the use of it on a child constitutes abusive and unreasonable force. While Appellant's hypotheticals raise interesting issues for discussion, they are not applicable in this case as we are concerned only with the application of the statute to Appellant's conduct. *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 3360, 73 L.Ed.2d 1113 (1982) ("the

traditional rule is that a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court").

¶ 94 Appellant further argues the definition of "person responsible for a child's health and welfare" is not included in § 7115 but was included in the jury instructions. He claims this added an element to the offense. He also argues the term "cohabitate" is vague.

¶ 95 Chapter 71 of Title 10 of the Oklahoma Statutes is known as the Oklahoma Child Abuse Reporting and Prevention Act. Section 7102 states the purpose behind the statute is "to provide for the protection of children who have been abused or neglected and who may be further threatened by the conduct of such persons responsible for the care and protection of such children." Definitions of terms used in the Act are set forth in § 7102(B). Included in this list of definitions is "person responsible for a child's health or safety." This definition provides in pertinent part:

> 5. "Person responsible for a child's health or safety" includes a parent; a legal guardian; custodian; a foster parent; a person eighteen (18) years of age or older with whom the child's parent cohabitates or any other adult residing in the home of the child;

10 O.S.Supp.1996, § 7102(B)(5). This definition was given to the jury in Instruction No. 18. The language is taken directly from OUJI–CR (2d) 4–39. This definition does not add an element to the offense of child abuse, but rather defines who can be held criminally responsible. Further, as read in the context of the statute, and as applied to Appellant's case, the term "cohabitate" is not vague so that persons of common intelligence would understand it to apply to Appellant, a person who lived with the children and intended to act in a parental role. Accordingly, we reject Appellant's constitutional challenges to 21 O.S.1991, § 701.7(C) and 10 O.S.Supp.1996, § 7115. This assignment of error is denied.

## FIRST STAGE JURY INSTRUCTIONS

### A.

¶ 96 In his third, ninth, and twelfth assignments of error, Appellant challenges first stage jury instructions. The determination of which instructions shall be given to the jury is a matter within the discretion of the trial court. *Patton v. State* 973 P.2d 270, 288 (Okl.Cr.1998), *cert. denied,* —— U.S. ——, 120 S.Ct. 347, 145 L.Ed.2d 271 (1999). Absent an abuse of that discretion, this Court will not interfere with the trial court's judgment if the instructions as a whole, accurately state the applicable law. *Id.* With this rule of law in mind, we review Appellant's allegations.

¶ 97 In his third assignment of error, Appellant contends his right to be free from *ex post facto* laws was violated as the jury was instructed on the elements of child abuse and child abuse murder which were not the law at the time of the offense. The prohibition against *ex post facto* law requires the finding of two elements: first, that the law was enacted subsequent to the conduct to which it was being applied; and second, that it must disadvantage the offender affected by it. *Allen v. State,* 821 P.2d 371, 375–76 (Okl. Cr.1991).

¶ 98 In the present case, Appellant was charged with causing the death of Shane on or about August 17, 1995. Appellant was also charged with abusing the other Coffman children between July 1995 and February 9, 1996. Prior to November 1995, the first degree murder by child abuse statute, 21 O.S.1991, § 701.7(C) referred to 21 O.S.1991, § 843, for its definition of child abuse. Under § 843, the elements of Permitting Child Abuse were: 1) knowingly, 2) permitting, 3) injury or use of unreasonable force, 4) upon a child under the age of 18, and 5) *by one under a legal duty to render aid to the child. Johnson v. State,* 751 P.2d 1094, 1096 (Okl. Cr.1988)

¶ 99 In November 1995, § 843 was renumbered as 10 O.S.Supp.1995, § 7115. In 1996, § 7115 was amended and the definition of "permitting" was added to the statute. The elements of "permitting" child abuse are: 1)

*a person responsible for a child's health or welfare;* 2) knowingly; 3) permitted; 4) injury/torture/maiming/(use of unreasonable force); 5) upon a child under the age of eighteen. OUJI–CR (2d) 4–37. The instructions given to the jury in this case referred to permitting and persons responsible for the child's health or welfare and were consistent with OUJI–CR (2d) 4–37.

¶ 100 In the first of his three challenges to the above stated law and instructions, Appellant argues the jury was improperly instructed under § 7115, a law that was enacted after the death of the victim and after many of the alleged acts of abuse were committed against the other Coffman children. He contends some of the prosecution's case implied he injured the children prior to November 1, 1995. As stated previously, Appellant's acts of child abuse were one continuous transaction; therefore, while there may have been some evidence of abuse inflicted by Appellant prior to November 1, 1995, most of the acts occurred after November 1995, and therefore it was not error to apply § 7115 to Appellant's case. Further, evidence showed that certain injuries to Tia and Isaac were, at the time of discovery in February 1996, relatively recent. That abuse certainly occurred after the enactment of 21 O.S.Supp.1995, § 7115.

¶ 101 Appellant next argues applying the element of *a person responsible for a child's health or welfare* contained in the 1996 amendment to § 7115 violated *ex post facto* principles as that element lowered the State's burden of proof. He asserts that at trial the prosecution merely had to show he was a person responsible for the children's health and welfare, a lesser burden than proving he had a legal duty to render aid as set forth in § 843.

¶ 102 The jury in this case was instructed in part as follows:

No person may be convicted of permitting the beating or injuring of a child unless the State has proved beyond a reasonable doubt each element of the crime. These elements are: *FIRST*, a person responsible for a child's health or welfare; *SECOND*, knowingly; *THIRD*, permitted;

*FOURTH*, injury, torture, or use of unreasonable force; *FIFTH*, upon a child under the age of eighteen.

OUJI–CR (2d) 4–37. The list of definitions given to the jury included the following:

Person responsible for a child's welfare—includes a parent, legal guardian, custodian, foster parent, a person eighteen years of age or older with whom the child's parent cohabitates or any other adult residing in the home of the child.

This language is consistent with 21 O.S.Supp. 1992, § 845(B)(4) renumbered as 10 O.S.Supp.1995, § 7102(B)(4). *See also* OUJI–CR (2d) 4–39.

¶ 103 Under the renumbered 21 O.S.1991, § 843, the element of *"by one under a legal duty to render aid to the child"* was defined in the uniform jury instructions as follows:

A person is under a legal duty to render aid to a child if [a statute imposes a duty to render aid to the child] [a (parent-child) (husband-wife) relationship exists between that person and the child] [a contractual duty to render aid to the child has been assumed by that person] [that person has voluntarily assumed the care of the child].

OUJI–CR (1st) 424.

¶ 104 Under 21 O.S.1991, § 843, in order to prove a legal duty to render aid, the prosecution had to prove a relationship between the defendant and the victim, either parent-child, husband-wife or a contractual duty to render aid to the child has been assumed by that person or that the defendant had voluntarily assumed the care of the child. Under 10 O.S.Supp.1995, § 7115, in order to support a finding that the defendant was responsible for the child's welfare, the prosecution had to prove a certain relationship between the defendant and the child, either that of parent, legal guardian, custodian, foster parent, a person eighteen years of age or older with whom the child's parent cohabitates or any other adult residing in the home of the child. Proving any of the alternatives in § 7115 is not any lesser of a burden than proving the minimum requirement under § 843 that the defendant had voluntarily assumed the care of the child.

¶ 105 Further, the evidence in this case clearly showed Appellant had a parent-child relationship with the children. Appellant stated he shared equal responsibility with Coffman in disciplining and parenting the children. He said he and Coffman wanted to be a family and provide the children with two parents. In statements concerning his disciplining of the children, he often stated "that's part of being parents." Coffman also stated she had given Appellant authority to discipline the children and that she, the children and Appellant were all trying to be a family. Under this evidence, the State proved the parent-child relationship as set forth in both §§ 843 and 7115. Any differences in the definitions of by one under a legal duty to render aid to the child and person responsible for a child's welfare did not disadvantage Appellant, deprive him of an available defense, nor change the facts necessary to establish guilt. Therefore, no *ex post facto* violation occurred.

¶ 106 Appellant next argues the inclusion of the definition of "permit" lessened the State's burden of proof. Prior to November 1, 1996, the term "permit" as used in 21 O.S.1991, § 843, and 10 O.S.Supp.1995, § 7115, was not defined by either this Court or the Legislature. In the 1996 amendment to § 7115, the Legislature defined "permit" as follows:

"[P]ermit" means to authorize or allow for the care of a child by an individual when the person authorizing or allowing such care knows or reasonably should know that the child will be placed at risk of abuse as proscribed by this section.

10 O.S.Supp.1996, § 7115.

¶ 107 This definition was given to the jury in Instruction No. 12. Appellant argues that giving this instruction was an *ex post facto* violation as the term did not exist at the time of Shane's death or during the abuse of the other children. Appellant is correct that the definition of "permit" was not included in the statute until after the crimes in this case were committed. However, the use of the term in this case did not disadvantage Appellant or lessen the State's burden of proof.

¶ 108 Under both §§ 843 and 7115, the State has to prove the element of permitting.

The definition of "permit" included in § 7115 merely reflected the common usage of the term. *Webster's* Dictionary defines "permit", in part, as:

1) To consent to: allow. 2) to give permission to or for: authorize. 3) to afford opportunity to: allow.

*Webster's II, New Riverside University Dictionary, pg.* 875–6. In specifically defining the term, the burden on the State was actually increased as it was required to prove the additional element that Appellant authorized or allowed the abuse to occur. Appellant did not suffer any disadvantage by the application of the term "permit" as defined in the jury instructions.

¶ 109 Further, Appellant argues that applying § 7115 to his case deprived him of an available defense. He contends that had the jury been instructed under the legal duty to render aid element of § 843, a defense that he did not intend to take control of parenting the Coffman children to the exclusion of their mother, would have completely defeated a conviction. He asserts that substituting "person responsible for a child's health or welfare" removed that defense.

¶ 110 A defense that Appellant did not have a legal duty to render aid would not have been a viable defense under the evidence in this case. By Appellant's own statements, he admitted to parenting and disciplining the children. Those admissions essentially deprived Appellant of any defense that he did not intend to take control of parenting the children to the exclusion of Bertha Coffman. Accordingly, applying § 7115 to Appellant's case did not deprive him of an available defense.

¶ 111 Although the trial court instructed the jury on certain definitions which were not in effect at the time of the crime, such definitions did not violate any *ex post facto* prohibitions as they neither inflicted a greater punishment than the law annexed to the crime when committed, altered any rules of evidence nor in any way disadvantaged Appellant. Therefore, this assignment of error is denied.

## B.

¶ 112 In his ninth assignment of error, Appellant contends the trial court erred in failing to instruct the jury on the lesser included offenses of second degree murder and second degree manslaughter. The trial court denied Appellant's requested instructions finding "no sufficient evidence to establish an element of depraved mind and conduct" to support second degree murder and "no evidence of possible negligent conduct" to support second degree manslaughter.

¶ 113 In a criminal prosecution, the trial court has the duty to correctly instruct the jury on the salient features of the law raised by the evidence without a request by the defendant. *Wing v. State,* 280 P.2d 740, 747 (Okl.Cr.1955). *See also Atterberry v. State* 731 P.2d 420, 422 (Okl.Cr.1986). This means that all lesser forms of homicide are necessarily included and instructions on lesser forms of homicide should be administered if they are supported by the evidence. *Shrum v. State,* 991 P.2d 1032, 1037–39 (Okl. Cr.1999).[8] In determining the sufficiency of the evidence to support a lesser offense we look at whether the evidence might allow a jury to acquit the defendant of the greater offense and convict him of the lesser. *See Hogan v. Gibson,* 197 F.3d 1297, 1305 (10th Cir.1999) *citing Beck v. Alabama,* 447 U.S. 625, 636, 100 S.Ct. 2382, 2388, 65 L.Ed.2d 392 (1980). Only if there is evidence which tends to negate an element of the greater offense, which would reduce the charge, should instructions on a lesser included offense be given. *See Fairchild,* 998 P.2d at 627. *See also United States v. Scalf,* 708 F.2d 1540, 1546 (10th Cir.1983) ("a lesser included offense instruction should not be given unless there is evidence to support a finding that the lesser offense was committed while the greater offense was not.").

¶ 114 Murder in the second degree occurs "[w]hen perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual." 21 O.S.1991, § 701.8(1). Appellant argues, and the State concedes, that when an individual wilfully or maliciously injures, tortures, or uses unreasonable force on a child there can be no question but that the individual is acting with a depraved mind. Appellant and the State also agree that in addition, committing the abuse which results in the death of a child, but without the intent to kill, is imminently dangerous conduct. However, as the State points out, these elements do not negate the element that the victim was a child.

¶ 115 By enacting 21 O.S.1991, § 701.7(C), the Legislature clearly intended to make a homicide occurring during the commission of or the permitting of child abuse to be first degree murder. *Drew,* 771 P.2d at 228. Where child abuse committed in violation of 21 O.S.1991, § 7115, results in the death of the child, the specific homicide provision of 21 O.S.1991, § 701.7(C), should be used. *Fairchild,* 998 P.2d at 627. Here, the victim was clearly a child, and Appellant has not shown that the greater offense of first degree murder was not committed. Therefore, the evidence did not support an instruction on second degree depraved mind murder.

¶ 116 Further, Appellant was not entitled to an instruction on second degree depraved mind murder as he has failed to show that under the evidence presented at trial, a rational jury would acquit him of first degree murder and find him guilty of the lesser offense of second degree murder. Appellant is entitled to an instruction on second degree murder only if the evidence at trial would allow a jury to rationally conclude that his conduct was not done with the intention of taking the life of an individual. 21 O.S. 1991, § 701.8(1).

¶ 117 Here the evidence showed that Appellant either willfully and intentionally participated in the abuse of Shane or that he knowingly permitted Coffman to abuse Shane to the extent that death resulted. The Coffman children testified Appellant acted with Coffman in each instance of abuse in-

---

8. While I disagree with this Court's failure to adhere to precedent in *Shrum,* I accede to its application in this case based upon the doctrine of *stare decises. Shrum,* 991 P.2d at 1037–39 (Lumpkin, V.P.J. concurring in result).

flicted on Shane the day he died. Coffman testified she disciplined Shane that day and that Appellant stayed in the other room, except for the two times he attended to the shower doors and the time she saw him exit the bathroom shortly before the victim was found not breathing. In his pre-trial statement, Appellant said all he did was spank Shane and put him in the bathtub. This evidence would lead a reasonable jury to conclude that either Appellant willfully and intentionally inflicted such abuse to the extent that Shane died as a result or that he did nothing at all. The evidence does not support a finding that Appellant merely acted with a depraved mind having no intention of taking the victim's life.

¶ 118 As for the offense of second degree manslaughter, to warrant such an instruction evidence must be presented at trial showing the defendant's culpable negligence. *Revilla v. State*, 877 P.2d 1143, 1149–50 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1096, 115 S.Ct. 764, 130 L.Ed.2d 661 (1995). The evidence here did not show a degree of carelessness amounting to a culpable disregard of the rights and safety of others to warrant an instruction on second degree manslaughter. *See id.*, 877 P.2d at 1149–50. Evidence of Appellant's active participation in the abuse of the victim would not lead a rational jury to acquit him of first degree murder and convict him of second degree manslaughter.

¶ 119 Further, this Court has held that a defendant is not entitled to instructions on any lesser included offense when he defends against the charge by proclaiming his innocence. *Hooker v. State*, 887 P.2d 1351, 1361 (Okl.Cr.1994), *cert. denied*, 516 U.S. 858, 116 S.Ct. 164, 133 L.Ed.2d 106 (1995); *Snow v. State*, 876 P.2d 291, 297 (Okl.Cr.1994), *cert. denied*, 513 U.S. 1179, 115 S.Ct. 1165, 130 L.Ed.2d 1120 (1995). Appellant's defense was that he did not commit nor did he know of any abuse to any of the children. He claimed he was asleep on the sofa while Coffman was in the bathroom with Shane. He confessed that his only bad act was hiding the body and lying about Shane's death. Here, the evidence showed either Appellant's wilful and malicious infliction of or his permitting the infliction of child abuse

or it showed he knew nothing about the abuse. Therefore, instructions on second degree murder and second degree manslaughter were not warranted. Accordingly, the trial court did not abuse its discretion in denying the requested instructions. This assignment of error is denied.

### C.

¶ 120 In his twelfth assignment of error, Appellant contends the jury instructions were defective as the jury was not instructed, under the alternative of permitting child abuse, that the State had to prove beyond a reasonable doubt that the acts of injury, torture or use of unreasonable force had to be committed wilfully or maliciously. Further, he contends the instructions given required only that the permission had to be knowing rather than wilful as the statute requires. Appellant contends he was prejudiced by these errors as the instructions allowed him to be convicted even if Coffman did not intend to harm or use unreasonable force.

¶ 121 The instructions given to the jury on permitting child abuse were taken directly from the uniform jury instructions. *See* OUJI–CR (2d) 4–37. The language of the uniform jury instruction appropriately tracks the language of 10 O.S.Supp.1996, § 7115. The instructions clearly informed the jury that Appellant could only be convicted of permitting child abuse if the injury, torture or use of unreasonable force, was committed wilfully or maliciously. We find no error in the instructions.

¶ 122 Appellant further argues providing the jury with the definition of persons responsible for a child's health or welfare was superfluous and enlarges the class of potential offenders beyond that which is already defined in the statute. Appellant's objection at trial to this definition and others contained in Instruction No. 18 has preserved this issue for appellate review.

¶ 123 The Committee Comments to OUJI–CR (2d) 4–37 indicate the term was included to restrict the persons who could be found guilty of permitting child abuse. The ·definition is limiting and does not enlarge the class

of potential offenders. The definition is not superfluous to the definition of permit but further restricts the application of the statute. The instructions, when taken as a whole, fairly and accurately state the applicable law. Accordingly, we find no error. This assignment of error is denied.

## SECOND STAGE ISSUES

### A.

¶ 124 Appellant contends in his second assignment of error that his death sentence violates the Eighth and Fourteenth Amendments, as well as Article II, § 9, of the Oklahoma Constitution because his conviction under 21 O.S.1991, § 701.7(C), failed to establish eligibility for the death sentence. In the first of several subpropositions, Appellant argues the State failed to prove he in fact killed, attempted to kill or was a major participant in a felony showing reckless indifference to human life. He contends that his death sentence can stand only if each of the theories underlying his murder conviction constitutionally justifies the imposition of a capital sentence. The State argues in response that the facts in this case are sufficient to support a finding that Appellant was eligible for the death sentence.

¶ 125 Initially we note the record shows that after the verdicts were rendered, defense counsel moved to strike the Bill of Particulars arguing that Appellant was no longer constitutionally eligible for the death penalty because the jury failed to find unanimously that he committed any intentional act which led to the death of the victim. This objection has properly preserved the issue for appellate review.

■■ ¶ 126 As addressed in Proposition I, the verdict in this case was a general verdict of guilt for first degree murder with the jury disagreeing as to the underlying factual basis. Therefore, we will review that factual basis in light of the applicable law to determine death eligibility.

¶ 127 In *Wisdom v. State*, 918 P.2d 384 (Okl.Cr.1996), we held that a defendant convicted of First Degree Murder by Child Abuse who actually killed the victim by his/

her own hand was eligible for the death sentence. Appellant acknowledges this ruling but urges reconsideration. We decline the offer. *See Fairchild*, 998 P.2d at 631. Here, the evidence supports a finding that Appellant actually killed the victim. Appellant participated in beating the victim prior to the time he was taken to the bathroom. Appellant was in the bathroom with the victim and Coffman, and after Coffman left the room, was seen exiting the bathroom immediately before Shane was found dead. This evidence certainly renders Appellant eligible for the death sentence.

■■■ ¶ 128 This Court has not previously ruled on whether a defendant convicted of First Degree Child Abuse Murder by permitting child abuse is death eligible. Both Appellant and the State direct us to *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) for the application of the death penalty to a defendant who does not kill by his/her own hand. In *Tison*, a felony-murder case in which the defendant himself did not kill, the Supreme Court held that a defendant who did not actually commit the act which caused death, but who was a major participant in the felony and who had displayed reckless indifference to human life, may be sufficiently culpable to receive the death penalty. 481 U.S. at 158, 107 S.Ct. at 1688. The Supreme Court stated:

> Similarly, we hold that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

*Id.* at 481 U.S. at 157–58, 107 S.Ct. at 1688.

¶ 129 *Tison* modified the Supreme Court's holding in *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), that the Eighth Amendment forbids the imposition of the death penalty on "one ... who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal

force will be employed." *Id.*, 458 U.S. at 797, 102 S.Ct. at 3376.

¶ 130 Although this Court has held that an *Enmund/Tison* analysis does not apply in the case of the actual killer, *see Wisdom*, 918 P.2d at 395, we find it does apply in a case where the defendant was not the actual killer. *See Hatch v. State*, 701 P.2d 1039, 1040 (Okl.Cr.1985), *cert. denied* 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986). In as much as one of the underlying theories of this case is murder by the permitting of child abuse, we apply the analysis used in *Enmund* and *Tison*.

¶ 131 Here, the evidence shows Appellant was a major participant in the felony. Acting jointly with Coffman, he took Shane outside the trailer and was party to conduct which elicited screams from the child. He and Coffman took Shane back inside the trailer, they both took him back to the bathroom and they both remained with him in the bathroom for periods of time. This evidence clearly supports the conclusion that his participation was major and substantial.

¶ 132 Appellant argues that, at worst, his conduct was that of an omission—of failing to protect the victim from a potentially dangerous situation—and not that of knowingly permitting the abuse to occur. To the contrary, Appellant's conduct was not merely the non-performance of what ought to be done, as in cases of criminal omissions. *See Wilkerson v. State*, 364 P.2d 709 (Okl.Cr.1961) (setting forth elements of failure to provide for a child under § 852 of Title 21). His active participation in the abuse occurring inside his small trailer is very different from a passive act of failing to provide what is required by law.

¶ 133 We next determine whether Appellant displayed reckless indifference to human life. In discussing this term in *Tison,* the Supreme Court stated "[a] critical facet of the individualized determination of culpability required in capital cases is the mental state with which the defendant commits the crime." 481 U.S. at 157, 107 S.Ct. at 1687. The Court further stated:

A narrow focus on the question of whether or not a given defendant "intended to kill," however, is a highly unsatisfactory means of definitively distinguishing the most culpable and dangerous of murderers. Many who intend to, and do, kill are not criminally liable at all—those who act in self-defense or with other justification or excuse ... On the other hand, some nonintentional murderers may be among the most dangerous and inhumane of all—the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property. This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an "intent to kill." ... "[I]n the common law, intentional killing is not the only basis for establishing the most egregious form of criminal homicide.... For example, the Model Penal Code treats reckless killing, 'manifesting extreme indifference to the value of human life,' as equivalent to purposeful and knowing killing"). *Enmund* held that when "intent to kill" results in its logical though not inevitable consequence—the taking of human life—the Eighth Amendment permits the State to exact the death penalty after a careful weighing of the aggravating and mitigating circumstances. Similarly, we hold that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

*Id.*, at 481 U.S. at 157–58, 107 S.Ct. at 1687–88.

¶ 134 In making the above determination, the Supreme Court also looked to the laws of several states and found that in the states which authorize capital punishment for felony-murder the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life. *Id.*, 481 U.S. at 153–54, 107 S.Ct. at 1685–86.

¶ 135 This Court has addressed reckless indifference to human life only as it pertains to those who actually killed. In doing so, we found a reckless indifference to human life turns largely on the facts of the case, but was evidenced in part by the defendant's creation of a desperate situation inherently dangerous to human life. *Hain v. State*, 919 P.2d 1130, 1146 (Okl.Cr.), *cert. denied*, 519 U.S. 1031, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996), and the defendant's causing the serious conscious physical suffering and death of the victim. *Brown v. State*, 989 P.2d 913, 931 (Okl.Cr. 1998).

¶ 136 The facts in the present case support a finding that Appellant acted with reckless indifference to human life. Acts in which Appellant participated outside the trailer caused injury to the child which elicited screams of pain. The child was brought back inside the trailer with swollen arms, a soft spot on his head, and irregular breathing. The victim had to be carried to the bathroom, an act in which Appellant again participated. Further acts in which Appellant participated inside the bathroom caused the victim to again scream and cry. Appellant was aware of the struggle between Coffman and the victim in which the victim was injured and property in the bathroom was damaged.

¶ 137 Appellant's argument focuses on the elements of the offense of permitting child abuse and asserts that terms "willfully" and "knowingly" contained in the statute and jury instruction on first degree murder by permitting child abuse are not the equivalent of reckless indifference for human life. The elements of the offense of first degree murder by permitting child abuse have previously been addressed in this opinion. We found the evidence in this case supported a finding of the existence of those elements beyond a reasonable doubt. Here, we look beyond those elements and find Appellant's conduct illustrated a reckless indifference to human life. The evidence supports a finding that Appellant subjectively appreciated that his conduct would likely result in the taking of innocent life. This is sufficient to make him eligible for the death penalty.

¶ 138 In this opinion, we have previously compared the crime of child abuse murder to the crime of felony-murder for purposes of determining sufficiency of the evidence to sustain a conviction. Such a comparison of the two offenses is again warranted during this discussion of the applicability of the death penalty. The eligibility of a defendant convicted of child abuse murder by the permitting of child abuse is similar to that of a non-triggerman convicted of felony-murder. In *Hatch*, 701 P.2d at 1040, a non-triggerman was sentenced to death for his participation in the underlying felonies. Hatch and co-defendant Ake forced their way into the victim's home, ransacked the home at gunpoint and repeatedly threatened to kill the family of four who occupied the house. Ake instructed Hatch to go outside, turn the car around, and "listen for the sound." Hatch did as he was told. Ake then shot each family member and fled the scene with Hatch. The two adult victims died while the two children survived. *Ake v. State*, 663 P.2d 1, 4 (Okl.Cr.1983).

¶ 139 In reviewing Hatch's death sentence, this Court stated:

In *Enmund*, the Supreme Court held that the death penalty cannot be constitutionally imposed against one who is convicted of felony murder for a killing occurring during the course of a robbery who neither kills, does not intend that life be taken, nor contemplates that lethal force will be employed by others. The evidence against appellant was that he entered his victims' home with a shotgun in hand. His confederate entered too with a loaded handgun. Appellant held the victims at gunpoint while Ake looted the home and attempted to rape his victims' twelve year old daughter. Appellant also took a turn attempting to rape her. Appellant frequently threatened the lives of his victims as they lay hog-tied on the floor. After a discussion as to their plan of action, appellant went outside and turned his automobile around while he waited "for the sound", as Ake had instructed him to do.

We agree with the trial court's finding that "the Defendant Hatch contemplated that a killing was not only possible, but probable

and further that lethal force probably be employed." Therefore, we find that appellant's sentences of death are justified and are in compliance with *Enmund* and we AFFIRM each.

*Hatch,* 701 P.2d at 1040.

¶ 140 The death sentence for a non-triggerman has also been upheld in other jurisdictions. In *Florida v. White,* 470 So.2d 1377 (Fla.1985), the defendant and two companions gained entrance to a home under a subterfuge. All three men were armed and wore masks. They tied up the people in the house and ransacked it. When one of the assailants' mask fell from his face, the three assailants discussed killing the victims. The defendant verbally opposed any killing. The two other assailants shot the victims, killing six of the eight. The three assailants then gathered up their loot and returned to the defendant's motel room where the loot was divided. The Supreme Court of Florida found that *Enmund* did not bar the imposition of the death penalty due to the defendant's presence both before, during and after the murders; his full and active role in capturing, intimidating and guarding the victims; his failure to disassociate himself from either the robbery or the murder while verbally opposing any killing; and the lack of any evidence he acted under coercion.

¶ 141 In *Fairchild v. Norris,* 21 F.3d 799 (8th Cir.1994) the Eighth Circuit Court of Appeals held the evidence supported a finding that the defendant non-triggerman was eligible for the death penalty. In that case, the defendant and an accomplice kidnapped, raped and killed a woman. The Court found the defendant fully participated in the kidnapping of the victim—followed her to her car, forced her inside at gunpoint, and took money from her purse. Upon arriving at a deserted house, he subsequently raped her. The defendant was outside of the house when the victim was shot by the accomplice. However, the defendant had been present when the gun was initially shown to the victim and death threats were made. The Eighth Circuit found the defendant's participation in the armed robbery, kidnapping and rape; his leaving the victim alone with the armed accomplice, and his failure to be deterred in his conduct by the victim's pleas for mercy were sufficient for a reasonable juror to find that he was a major participant in the felonies and that he acted with reckless indifference to human life.

¶ 142 Accordingly, evidence in the present case of Appellant's full, active and knowing participation in the underlying acts of child abuse inflicted upon Shane, his failure to disassociate himself from those acts of abuse perpetrated by Bertha Coffman, and his failure to either be deterred in his conduct or respond in any positive manner to what surely must have been pleas for mercy from the victim, were sufficient for a reasonable juror to find beyond a reasonable doubt that he was a major participant in the child abuse and that he acted with reckless indifference to human life.

¶ 143 Appellant next argues his death sentence should be modified as an *Enmund/Tison* analysis was not done by the trial court and it would be improper for this Court to conduct such a review on appeal. In *Cabana v. Bullock,* 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986), the Supreme Court stated that the Eighth Amendment does not require that a jury make the findings required by *Enmund*; an appellate court, a trial judge, or a jury may make the requisite findings. *Id.* at 474 U.S. at 392, 106 S.Ct. at 700. This Court can review the record and make the findings required by *Enmund* and *Tison*. Reviewing the evidence in this case, we find the facts support a finding that Appellant's major participation in the felony of child abuse, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement.

¶ 144 Finally, Appellant argues the death penalty is constitutionally disproportionate to the crime of permitting child abuse murder. He contends the death penalty is excessive as: (1) it does not contribute to the goals of punishment and results in needless imposition of pain and suffering, and (2) the punishment is grossly disproportionate to the severity of the crime. *See Coker v. Georgia,* 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977). In discussing the consti-

923

tutionality of the death sentence for a defendant who did not kill, the Supreme Court in *Enmund* stated:

> In *Gregg v. Georgia* the opinion announcing the judgment observed that "[t]he death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders." (citation omitted). Unless the death penalty when applied to those in Enmund's position measurably contributes to one or both of these goals, it "is nothing more than the purposeless and needless imposition of pain and suffering," and hence an unconstitutional punishment. *Coker v. Georgia*, 433 U.S. at 592, 97 S.Ct. at 2866.

*Enmund*, 458 U.S. at 798, 102 S.Ct. at 3377.

¶ 145 The Supreme Court stated that neither the deterrent nor the retributive purposes of the death penalty were advanced by imposing the death penalty upon Enmund as the Court was unconvinced "that the threat that the death penalty will be imposed for murder will measurably deter one who does not kill and has no intention or purpose that life will be taken." *Id.*, at 458 U.S. at 798–799, 102 S.Ct. at 3377. In reaching this conclusion, the Court relied upon the fact that killing only rarely occurred during the course of robberies, and such killing as did occur even more rarely resulted in death sentences if the evidence did not support an inference that the defendant intended to kill. *Id.*, at 458 U.S. at 799, 102 S.Ct. at 3377–78.

¶ 146 As for the principle of retribution, the Court stated the heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender.

> As for retribution as a justification for executing Enmund, we think this very much depends on the degree of Enmund's culpability—what Enmund's intentions, expectations, and actions were. American criminal law has long considered a defendant's intention—and therefore his moral guilt—to be critical to "the degree of [his] criminal culpability," (citation omitted), and the Court has found criminal penalties

to be unconstitutionally excessive in the absence of intentional wrongdoing.

*Id.*, at 458 U.S. at 800, 102 S.Ct. at 3378;

¶ 147 Enmund was the driver of the "getaway" car in an armed robbery of a dwelling. The occupants of the house, an elderly couple, resisted and Enmund's accomplices killed them. The result in *Enmund* did not turn on the mere fact that Enmund was convicted of felony murder. It is important to note how attenuated was Enmund's responsibility for the deaths of the victims in that case.

¶ 148 In the present case, Appellant was convicted of first degree murder by child abuse by the commission of the child abuse or in the alternative first degree murder by child abuse through the willful permitting of child abuse. 21 O.S.1991, § 701.7(C). We have determined the evidence is sufficient to support either of the alternative ways to commit first degree murder under the statute. The offense of willfully permitting child abuse murder requires a knowing and willful permitting of child abuse to occur by a person authorized to care for the child. Child abuse does not always result in death, but death is the result often enough that the death penalty should be considered as a justifiable deterrent to the felony itself. Children are the most vulnerable citizens in our communities. They are dependent on parents, and others charged in their care, for sustenance, protection, care and guidance. Depending on age and physical development they tend to be more susceptible to physical harm, and even death, if unreasonable force is inflicted upon them. Within this context, legislative action to address the specific crime of child abuse murder is legally justified.

¶ 149 Applying the death penalty to this situation wherein Appellant, willfully, purposefully and knowingly allowed the victim to be abused to the extent that death resulted, when he was in a position to have prevented that abuse, certainly serves both the deterrent and retributive purposes of the death penalty. The threat that the death penalty will be imposed for permitting child abuse which results in the death of the child accentuates the responsibility a parent or person

charged with the care and protection of a child has to that child and will deter one who permits that abuse.

¶ 150 As for retribution, Appellant's personal culpability in this situation is high. The situation is quite different from that where the child abuse occurs and the individual is not aware of the abuse. Appellant's responsibility for the death of the victim was not so attenuated as was that of Enmund who merely waited in the car while the victims were shot and had no knowledge of or immediate control over the actions of his co-defendants. Appellant's personal participation in permitting Coffman to abuse the victim to the extent that death resulted was major and substantial, and there was proof that such participation was wilful and knowing. Therefore the death penalty is not excessive retribution for his crime.

¶ 151 Accordingly, we find the requirements of *Enmund* and *Tison* have been met, and the death penalty is an appropriate punishment for the crime of first degree murder by permitting child abuse in these circumstances. This assignment of error is denied.

## B.

¶ 152 In his seventh assignment of error, Appellant challenges the sufficiency of the evidence supporting the two aggravating circumstances found in this case, *i.e.,* that the murder was especially heinous, atrocious or cruel and that Appellant was a continuing threat to society. Upon the State's motion, all first stage evidence was adopted and incorporated into the sentencing stage and no additional evidence was introduced. "When the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, the proper test is whether there was any competent evidence to support the State's charge that the aggravating circumstance existed." *Romano,* 847 P.2d at 387. "In making this determination, this Court should view the evidence in the light most favorable to the State." *Id.*

¶ 153 The jury found the evidence sufficient to support the aggravator that the murder was especially heinous, atrocious, or cruel. This aggravator requires

proof that the death was preceded by torture or serious physical abuse. *Revilla,* 877 P.2d at 1155. This includes evidence which shows the infliction of either great physical anguish or extreme mental cruelty. *Hain,* 919 P.2d at 1146. After making the above determination, the attitude of the killer and the pitiless nature of the crime can also be considered. *Robinson v. State,* 900 P.2d 389, 402 (Okl.Cr. 1995); *Revilla,* 877 P.2d at 1155.

¶ 154 Appellant relies on *Barnett v. State,* 853 P.2d 226 (Okl.Cr.1993), and *Hawkins v. State,* 891 P.2d 586 (Okl.Cr.1994) to support his argument the aggravator is not supported here. In *Barnett,* this Court invalidated the aggravator due to the defendant's minimal participation. This Court stated that while the facts of the case supported a finding that the murder was especially heinous, atrocious or cruel, the facts also indicated that the vast majority of the acts upon which the aggravator was based, were perpetrated against the victim by a co-defendant, with many acts occurring in the absence of the defendant. The Court held "[b]ecause the evidence shows that the appellant's actual, physical participation in the most brutal acts was minimal, we find that the mitigating evidence outweighs this remaining aggravating circumstance." *Id.* 853 P.2d at 234.

¶ 155 In *Hawkins,* Appellant directs us to footnote 3 wherein the Court stated that in analyzing the evidence supporting the "especially heinous, atrocious or cruel" aggravator it "did not consider the multiple rapes of the victim while she was held captive in the barn, for the appellant did not commit them, and the record contains no evidence to connect him to them in any way." 891 P.2d at 600, fn. 3.

¶ 156 Both *Barnett* and *Hawkins* are distinguishable from the present case. Whether Appellant actually delivered the fatal blows or whether he permitted Coffman to inflict the fatal blows, his actual participation in the abuse preceding the victim's death was substantial. The vicious beatings and abuse Shane suffered either from or because of Appellant support a finding that his death was preceded by serious physical abuse. This is sufficient to support the especially heinous, atrocious or cruel aggravator.

¶ 157 "To support the aggravator of continuing threat, the State must present evidence showing the defendant's behavior demonstrated a threat to society and a probability that threat would continue to exist in the future." *Hain,* 919 P.2d at 1147. In evaluating whether there is a probability that the defendant will commit acts of violence which will constitute a continuing threat to society, we have held that evidence of the callousness of the murder for which the defendant was convicted can be considered as supporting evidence, as well as prior criminal history and the facts of the murder for which the defendant was convicted. *Revilla,* 877 P.2d at 1155–56.

¶ 158 The record reflects that it was undisputed that Appellant had no criminal history. In overruling the defense's demurrer or request to dismiss the aggravator the trial court stated the aggravator could be supported by evidence of the callousness with which the crime was committed. Appellant now repeats the argument raised at trial— the jury's verdict failed to determine who actually inflicted the abuse upon Shane therefore it is impossible to determine "who made the murder [callous]".

¶ 159 The jury's verdict of guilt for first degree murder by child abuse found Appellant criminally responsible for the death of Shane. The callous nature in which that offense was committed, either by Appellant's own hand or through his authorization of Coffman's acts, can be determined by looking at the facts of the case.

¶ 160 The evidence shows the abuse was inflicted without any regard for the screams and cries of the victim. The victim was repeatedly abused while in the bathroom. This was after he had been carried to the bathroom as a result of the beatings inflicted outside which resulted in a soft spot on his head and swollen arms. To continue to abuse the child in the face of the obvious physical injuries and suffering illustrates the callous nature in which this crime was committed. Appellant's conduct of either continuing to inflict abuse or allowing further abuse to be inflicted shows his attitude, a critical determination in finding this aggrava-

tor, of complete disregard for the victim's life. *See Hain,* 919 P.2d at 1147.

¶ 161 However, it is the evidence of future dangerousness, not the crime itself, that is relevant for the jury's consideration. *Roberts v. State,* 868 P.2d 712, 719–20 (Okl. Cr.), *cert. denied,* 513 U.S. 855, 115 S.Ct. 158, 130 L.Ed.2d 96 (1994). Appellant's abuse of Shane, together with the escalating level of abuse inflicted upon Isaac and Tia, clearly shows a pattern of criminal conduct which supports a finding that Appellant posed a continuing threat to society. Finding both aggravating circumstances supported by sufficient evidence, this assignment of error is denied.

**C.**

¶ 162 In his eleventh assignment of error, Appellant challenges the constitutionality of the two aggravating circumstances found by the jury. The uniform jury instruction on the aggravator of continuing threat to society was given to the jury in Instruction in Supplemental Instruction No. 6. (O.R.1003). *See* OUJI–CR (2d) 4–74. Appellant contends this instruction not only fails to limit the aggravator but broadens its application by not requiring the State to prove beyond a reasonable doubt the probability the defendant will commit future acts of violence. This same argument was raised and rejected by this Court in *Short v. State,* 980 P.2d 1081, 1103–04 (Okl.Cr.1999). In rejecting this challenge to OUJI–CR (2d) 4–74, we found that when the instruction is read in its entirety, it is clear the State has the burden of proving the defendant had a history of criminal conduct that would likely continue in the future and that such conduct would constitute a continuing threat to society. *Id.* 980 P.2d at 1104. We will not revisit the issue.

¶ 163 Further, Appellant complains the aggravator of especially, heinous, atrocious or cruel is unconstitutional as the term serious physical abuse is vague and subject to varying meanings.

¶ 164 The jury was given the uniform instruction on this aggravator. *See* OUJI–CR (2d ) 4–73. The proper application of this aggravator was set forth in *Cheney v. State,*

909 P.2d 74, 80 (Okl.Cr.1995). The constitutionally of this aggravator has been repeatedly upheld. *Short,* 980 P.2d at 1103; *Ledbetter v. State,* 933 P.2d 880, 898 (Okl.Cr.1997); *Nuckols v. State,* 805 P.2d 672, 674 (Okl.Cr.), *cert. denied,* 500 U.S. 960, 111 S.Ct. 2276, 114 L.Ed.2d 727 (1991). Appellant's argument has not persuaded us to change our mind. This proposition is denied.

### INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

¶ 165 Appellant contends in his thirteenth assignment of error that he was denied a fair trial and reliable sentencing proceeding by the ineffective assistance of counsel. An analysis of an ineffective assistance of counsel claim begins with the presumption that trial counsel was competent to provide the guiding hand that the accused needed, and therefore the burden is on the accused to demonstrate both a deficient performance and resulting prejudice. *Strickland v. Washington,* at 466 U.S. at 687, 104 S.Ct. at 2064. *See also Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). *Strickland* sets forth the two-part test which must be applied to determine whether a defendant has been denied effective assistance of counsel. First, the defendant must show that counsel's performance was deficient, and second, he must show the deficient performance prejudiced the defense.[9] Unless the defendant makes both showings, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." *Id.,* 466 U.S. at 687, 104 S.Ct. at 2064. Appellant must demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. *Id.,* 466 U.S. at 688–89, 104 S.Ct. at 2065. The burden rests with Appellant to show that there is a reasonable probability that, but for any unprofessional errors by counsel, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.,* 466 U.S. at 698, 104 S.Ct. at 2070. This Court has stated the issue is whether counsel exercised the skill, judgment and diligence of a reasonably competent defense attorney in light of his overall performance. *Bryson v. State,* 876 P.2d 240, 264 (Okl.Cr.1994), *cert. denied* 513 U.S. 1090, 115 S.Ct. 752, 130 L.Ed.2d 651 (1995).

¶ 166 Appellant raises one claim of ineffectiveness, *i.e,* counsel was ineffective for failing to object to jury instructions which addressed law which was not applicable to his case. The appropriateness of the instructions given to the jury concerning the law of first degree child abuse murder and child abuse were addressed by this Court in Proposition III. There we found any error in the instructions was harmless as it did not prejudice Appellant. When a claim of ineffectiveness of counsel can be disposed of on the ground of lack of prejudice, that course should be followed. *Strickland,* 466 U.S. at

---

9. In explaining the prejudice prong of *Strickland,* this Court has previously relied on *Lockhart v. Fretwell,* 506 U.S. 364, 369–70, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180, 189 (1993) to the extent that an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. Our reliance upon *Lockhart's* analysis into the fundamental fairness of the trial to explain one prong of the *Strickland* test was based upon language from *Strickland* that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result," 466 U.S. at 686, 104 S.Ct. at 2064, and "[s]econd, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were

so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." 466 U.S. at 694, 104 S.Ct. at 2064. However, recently in *Williams v. Taylor,* ⸺ U.S. ⸺, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) the Supreme Court backed away from its emphasis on the fundamental fairness of the trial analysis of the prejudice determination. The Court stated that an analysis of the prejudice prong was to focus solely on whether there was a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* Therefore, pursuant to *Williams,* our analysis of an ineffective assistance of counsel claim is based solely upon the two prong test set forth in *Strickland,* and our prejudice determination is based upon whether the outcome of the trial would have been different but for counsel's unprofessional errors.

697, 104 S.Ct. at 2069. Defense counsel's failure to object to the instructions, did not, therefore, constitute ineffective assistance. *Valdez v. State*, 900 P.2d 363, 388 (Okl.Cr. 1995), *cert. denied*, 516 U.S. 967, 116 S.Ct. 425, 133 L.Ed.2d 341 (1995). This assignment of error is denied.

■ ¶ 167 Filed with the direct appeal is an Application for Evidentiary Hearing on Sixth Amendment Claim and Motion to Supplement, pursuant to Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (1998). Appellant asserts in the Application that counsel was ineffective in failing to investigate and utilize available mitigating evidence. Attached to the Application are twelve (12) affidavits. The first two (2) affidavits are from Appellant's trial counsel wherein they state they received boxes of medical records from Saint Anthony's Hospital pertaining to injuries Appellant suffered in a 1993 automobile accident. Both counsel state they did not see any reference to a C.A.T. (Computer Axial Tomograph) scan in the records, therefore they made no attempt to locate such. Both counsel also state that during their investigation of the case, they spoke to several people who mentioned drastic personality changes in Appellant since the 1993 accident. Counsel also stated that at the time of trial, they did not know the true extent of the physical and/or psychological damage suffered by Appellant as a result of the accident. (Exhibits A and B).

¶ 168 The third affidavit is from Michael L. Johns, an investigator in the Capital Direct Appeal Division of the Oklahoma Indigent Defense System. Mr. Johns stated he reviewed the files provided by Appellant's trial counsel and discovered "two Radiological Reports which indicated that two series of C.A.T. scans were taken of [Appellant's] brain and skull. The first series was done on March 15, 1993, and the second series was done on March 22, 1993." Mr. Johns also stated that on May 6, 1999, he personally picked up from Saint Anthony's Hospital copies of all of the C.A.T. scans conducted on Appellant. (Exhibit C).

¶ 169 The next three (3) affidavits are from C. Alan Hopewell, Ph.D., Albert V. Messina,

M.D., and Jay A. Rosenblum, M.D. Dr. Hopewell stated he conducted a neuropsychological evaluation of Appellant on May 24, 1999, at the Oklahoma State Penitentiary. Based upon that testing, Dr. Hopewell concluded Appellant suffers from "irreversible organic brain syndrome which is chronic in nature and which [ ] classic for this type of damage and which is a direct result of traumatic head injury." (Exhibit D, pg. 18). Dr. Messina stated he evaluated the C.A.T. scans and medical records concerning Appellant. He concluded the records indicated extensive brain damage to Appellant's right frontal lobe and right temporal lobe which remains and results from the prior motor vehicle accident on March 12, 1993. (Exhibit E). Dr. Rosenblum stated he evaluated the reports of Drs. Hopewell and Messina, as well as Appellant's medical records. He verified the findings of Drs. Hopewell and Messina and concluded that Appellant's "severe brain damage in the area most affected is compatible with Dr. Hopewell's neuropsychological evaluation. As a result, [Appellant's] prognosis for improvement is very poor and permanent." (Exhibit F).

¶ 170 The remaining six (6) affidavits are from family, friends and co-workers who state that Appellant exhibited drastic personality changes after the 1993 automobile accident. Appellant's mother and step-father state that prior to the accident Appellant did not act out of the ordinary, and showed attention to his appearance and household. However, after the accident he withdrew, became careless with his appearance, and took on bizarre habits such as eating only certain foods and having an unnatural fear of other food items. (Exhibits G and H.) Friends and co-workers stated Appellant often seemed distant and unaware of his surroundings after the accident (Exhibits I, J, K, and L).

¶ 171 Appellant's Application contends the information contained in the affidavits constitute the "clear and convincing evidence" necessary under Rule 3.11(B)(3)(b)(i) to demonstrate a strong possibility trial counsel was ineffective. Accordingly, Appellant urges this Court to so find and to order an eviden-

tiary hearing to fully address the ineffectiveness issue.

¶ 172 Rule 3.11(B)(3)(6) allows an appellant to request an evidentiary hearing when it is alleged on appeal that trial counsel was ineffective for failing to "utilize available evidence which could have been made available during the course of trial...." Once an application has been properly submitted along with supporting affidavits, this Court reviews the application to see if it contains "sufficient evidence to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." Rule 3.11(B)(3)(b)(i).

¶ 173 Upon review of the affidavits, we find trial counsel was aware of the automobile accident and any personality changes in Appellant since the accident. However, the record reflects that with that knowledge, counsel chose a defense of actual innocence, not one of diminished capacity. That strategic choice is not indicative of deficient performance as a defense of actual innocence was reasonable based upon information provided to counsel by Appellant's family and friends.

> "[A]n attorney who makes a strategic choice to channel his investigation into fewer than all plausible lines of defense upon which he bases his strategy are reasonable and his choices on the basis of those assumptions are reasonable ...," An attorney's decision not to interview witnesses and to rely on other sources of information, if made in the exercise of professional judgment, is not ineffective counsel.

*Boltz v. State,* 806 P.2d 1117, 1126 (Okl.Cr. 1991), *cert. denied,* 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991), *quoting United States v. Glick,* 710 F.2d 639, 644 (10th.Cir.1983).

■ ¶ 174 Here, Appellant told police he never abused Shane, but merely assisted in the decision concerning what to do with the body and the removal of the body. Further, he said he never abused any of the other children, that it was Bertha Coffman who abused the children. Appellant's mother and step-father testified they never saw Appellant abuse the children and that the children appeared to be fond of Appellant. Based

upon this evidence, it was a reasonable decision based upon their professional judgment for defense counsel to focus on Bertha Coffman as the actual perpetrator and pursue a defense of actual innocence on Appellant's part. That the strategy proved unsuccessful is not grounds for branding counsel ineffective. Absent a showing of incompetence, the appellant is bound by the decisions of his counsel and mistakes in tactic and trial strategy do not provide grounds for subsequent attack. *Davis v. State,* 759 P.2d 1033, 1036 (Okl.Cr.1988). To have also raised any type of mental disorder defense would have been inconsistent with a defense of actual innocence and would have considerably weakened both defenses. Counsel's decision in this case was reasonable trial strategy, which we will not second guess on appeal. *Bernay v. State,* 989 P.2d 998, 1015 (Okl.Cr.1999).

■ ¶ 175 Further, counsel was not ineffective for failing to present evidence of the injury during second stage. The record shows the second stage defense focused on Appellant being a productive and contributing member of society therefore, he deserved a punishment less than death. This included evidence of his lack of any prior violent conduct and his skills and ability to maintain employment. While evidence of Appellant's mental condition and his inability to control his "explosive behavior" may have had some mitigating effect, this evidence could be a two-edged sword. Evidence that Appellant had poor control over his behavior had the potential of proving Appellant was a threat to society, including prison society, and could indicate a propensity for future violence. Such evidence would have been contradictory to mitigating evidence of Appellant's lack of culpability and lack of violent conduct. Counsel's strategic decision to pursue a second stage defense that Appellant was less culpable than Coffman, and highlight the positive traits of his character instead of focusing on any mental problems he might have was well within the range of professional reasonable judgment.

¶ 176 While Appellant has provided a great deal of information in his affidavits, we find he has failed to set forth sufficient evidence

to warrant an evidentiary hearing. He has failed to show by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to utilize the complained-of evidence. *Short,* 980 P.2d at 1109. Accordingly, we decline to grant Appellant's application for an evidentiary hearing.

### ACCUMULATION OF ERROR CLAIM

¶ 177 In his fourteenth and final assignment of error, Appellant contends the aggregate impact of the errors in this case warrants reversal of his convictions and at the very least modification of his death sentence. This Court has repeatedly held that a cumulative error argument has no merit when this Court fails to sustain any of the other errors raised by Appellant. *Ashinsky v. State,* 780 P.2d 201, 209 (Okl.Cr.1989); *Weeks v. State,* 745 P.2d 1194, 1196 (Okl.Cr. 1987). However, when there have been numerous irregularities during the course of a trial that tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors is to deny the defendant a fair trial. *Bechtel v. State,* 738 P.2d 559, 561 (Okl.Cr.1987). While certain errors did occur in this case, even considered together, they were not so egregious or numerous as to have denied Appellant a fair trial. Therefore, no new trial or modification of sentence is warranted and this assignment of error is denied.

### MANDATORY SENTENCE REVIEW

¶ 178 Pursuant to 21 O.S.1991, § 701.13(C), we must determine (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and (2) whether the evidence supports the jury's finding of the aggravating circumstances as enumerated in 21 O.S.1991, § 701.12. Turning to the second portion of this mandate, the jury found the existence of two (2) aggravating circumstances: 1) the murder was especially heinous, atrocious, or cruel; and 2) there was an existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.1991, § 701.12(4)(7). As dis-

cussed previously in this opinion, each of these aggravators was supported by sufficient evidence.

¶ 179 We now turn to the mitigating evidence. Appellant presented two (2) witnesses in second stage, his mother and Hart Brown, the Cleveland County Jail Administrator. Mr. Hart testified that while incarcerated in the Cleveland County Jail, Appellant had received no disciplinary reports, he complied with any instructions given him and he was not a threat to other inmates. Sharon Wilson, Appellant's mother, testified Appellant had been honorably discharged from the United States Air Force, that he had been employed throughout his life and he did not have a criminal record. She stated Appellant was a handy-man who had worked in landscaping, fencing, remodeling, plumbing, etc. She also stated he did not have a history of violent conduct, and if his life was spared, he would have the continuing love and support of his family. This evidence was summarized into twelve (12) factors and submitted to the jury for their consideration as mitigating evidence, as well as any other circumstances the jury might find existing or mitigating.

¶ 180 Upon our review of the record and careful weighing of the aggravating circumstances and the mitigating evidence, we find the sentence of death to be factually substantiated and appropriate. Under the record before this Court, we cannot say the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S. 1991, § 701.13(C), in finding that the aggravating circumstances outweighed the mitigating evidence. Accordingly, finding no error warranting reversal or modification, the **JUDGMENTS** and **SENTENCES** are **AFFIRMED**.

LILE, J.: concur.

STRUBHAR, P.J., and JOHNSON, J.: concur in result.

CHAPEL, J.: dissent.

STRUBHAR, Presiding Judge, concurs in result:

¶ 1 Based on the doctrine of stare decisis, I concur in the results reached by the Court in

this case. I continue to believe that First Degree Murder By Child Abuse is and should be a specific intent crime as I expressed in *Fairchild v. State*, 1998 OK CR 47, 965 P.2d 391, 403 (Lane, J. dissenting joined by Strubhar, V.P.J.), *opinion withdrawn and rehearing granted*, 1999 OK CR 30, 992 P.2d 349, *followed by opinion on rehearing*, 1999 OK CR 49, 998 P.2d 611 (Strubhar, P.J. dissenting). I further maintain that a culpability assessment, i.e. a finding of intentional harm, must be made at some point in the process for the death penalty to be constitutionally sound in capital child abuse murder cases even if the defendant is the actual killer. *See Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987); *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). However, I yield to the majority here and agree that Gilson's death sentence is valid based on the culpability assessment performed by the Court regardless of whether he committed or permitted the child abuse that led to Coffman's death.

¶ 2 As the majority concludes, I, too, agree the modified verdict forms in this case were harmless. Again this Court must stress the importance of using the uniform instructions and verdict forms.

CHAPEL, J., dissenting:

¶ 1 I dissent. This was a horrible crime. The opinion devotes the first ten pages to the terrible facts of this case, and repeats the facts often throughout the subsequent pages. I believe the opinion dwells on these facts unnecessarily. I agree they are appalling, but this Court's job is to review the trial record for claimed legal errors. Rather than analyze the legal issues the majority puts forth the horrible facts and then tries to mold the law to satisfy its decision to affirm the case. Were it otherwise, the excruciating factual detail would not be necessary and the absurd length of the opinion could be reduced from 93 pages to something less. I

find errors in the first and second stages of trial which deprived Gilson of a fair trial and reliable sentencing procedures.

¶ 2 Gilson was convicted in the alternative of child abuse murder by committing *or* permitting child abuse. The opinion concludes that a conviction for child abuse murder by permitting renders a defendant death-eligible, because "death is the result often enough that the death penalty should be considered as a justifiable deterrent to the felony itself." [1] I disagree. I do not believe it is appropriate to apply *Enmund/Tison* [2] reasoning under these circumstances. The opinion uses *Enmund/Tison* to conclude that Gilson's *actions* showed his participation in Shane Coffman's death was "major" and "substantial", and that Gilson *acted* with reckless indifference to human life. The majority states that Gilson's "active participation in the abuse" distinguishes his case from the passive circumstances of failure to provide or other criminal omissions. However, this analysis focuses on Gilson's actions which contributed to Shane Coffman's death—that is, whether his actions assisted the co-defendant significantly enough to support a finding that he was responsible for the murder. In other words, this analysis focuses on whether Gilson assisted in *committing* the crime of murder. This error in analysis renders irrelevant the majority's comparison of permitting child abuse murder to felony murder by a non-triggerman. The majority cites cases in which participants in felony murder were eligible for the death penalty, even though they did not kill, where each defendant participated in crimes which resulted in murders, and each defendant contemplated the use of killing or lethal force. Again, the focus is on a defendant's *actions* in *assisting* co-defendants who subsequently killed.

¶ 3 The crime of *permitting* requires only that the defendant allows another to commit child abuse murder. No action is required—

1. At 923–924.

2. *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), held the death penalty may be imposed only where the defendant intended life be taken or contemplated that

lethal force would be used. *Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), required a finding that the defendant had substantial personal involvement in the underlying felony and exhibited reckless disregard or indifference to the value of human life.

all that is necessary is that the defendant knows that child abuse is occurring but does not stop someone else from committing the crime. There can be no *Enmund/Tison* analysis for a defendant who *permits* child abuse murder, because that person need neither intend that life be taken, contemplate lethal force would be used, have a substantial personal involvement in the crime, or exhibit reckless indifference to human life. *Enmund/Tison* focuses specifically on a defendant's personal culpability for murder. Looked at in the light most favorable to the State, the evidence that Gilson permitted child abuse murder is that he knew his co-defendant was abusing Shane Coffman on August 17, 1995, and he did not stop her. This evidence is wholly insufficient to conduct an *Enmund/Tison* review, and evidence of permitting can never support the questions raised in such a review.

¶4 Child abuse in any form is a heinous crime. I agree with the majority that the legislature may address the specific crime of child abuse murder. However, I do not believe the legislature can constitutionally make a defendant convicted of child abuse murder by permitting abuse death-eligible. A defendant must have some personal culpability, beyond knowing about and failing to stop another from committing a crime, before the State may impose the ultimate punishment. Whatever the merits of the majority's conclusion that Gilson was personally culpable for *committing* the murder, its conclusion that Gilson was culpable for *permitting* the murder cannot be legally justified. I cannot affirm the death penalty in this case.[3]

¶5 It is also clear that Gilson was not convicted of child abuse murder beyond a reasonable doubt. The jury was instructed that the verdict as to guilt for murder must be unanimous, but jurors did not need to agree unanimously as to the theory supporting guilt (referring to committing rather than permitting child abuse murder).[4] The verdict form indicates jurors found Gilson guilty of first degree murder but were divided as to the underlying theory.[5] The majority finds no error by comparing this to cases where a jury returns a general verdict when a defendant is charged in the alternative with malice and felony murder. In those cases, as long as evidence supports both theories and the question goes merely to the factual basis of the crime, the Court upholds a general verdict. In fact, the majority here goes out of its way to find that child abuse murder will be interpreted as felony murder, apparently to strengthen its analogy to these cases. However, where a defendant is charged in the alternative we treat the conviction as felony murder rather than malice murder (e.g., reversing any conviction for an underlying felony).[6] That is, we make a choice between the two alternatives, choosing the one where we are confident the jury was unanimous regarding the underlying theory.

¶6 The opinion also determines that *Schad v. Arizona*[7], discussing general verdicts in felony-murder cases, supports a conclusion that disagreement as to the factual theory does not invalidate a conviction for murder charged in the alternative. Even assuming the majority correctly treats "committing" and "permitting" as mere factual bases for a single charge of murder, the majority opinion misses the point. We do not have a general verdict here. We *know* the theories under which jurors determined Gilson's guilt, and we *know* the jury was not unanimous. At least some jurors had reasonable doubt as to each underlying theory. To interpret "child abuse murder" as "felony murder" does not

---

**3.** In addition, I would not uphold the continuing threat aggravating circumstance. Gilson had no previous criminal record, and the majority finds sufficient evidence for this circumstance based on the callous nature of the crime and the pattern of criminal conduct evident in Gilson's abuse of three children. I disagree with the use of circumstances of the crime to support this aggravating circumstance. *Hooper v. State*, 1997 OK CR 64, 947 P.2d 1090, 1108, n. 58, *cert. denied*, 118 S.Ct. 2353, 118 S.Ct. 2353, 141 L.Ed.2d 722 (1998).

**4.** Instruction No. 14, CF 96–245 O.R. 954.

**5.** Verdict Form, CF 96–245 O.R. 1016.

**6.** *Alverson v. State*, 1999 OK CR 21, 983 P.2d 498, 521.

**7.** 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991).

change this fact; jurors were divided as to the basis for guilt—the underlying felonies. Under these circumstances, the jury's verdict violated Gilson's right to a unanimous verdict "wholly determinative of the guilt or innocence of a defendant." [8]   I would remand for a new trial in which a jury, correctly instructed and with the appropriate verdict forms, has the opportunity to return a general verdict of guilt.

¶ 7 I also believe the trial court erred in failing to give lesser included instructions. The majority correctly cites the *Shrum* [9] test, that all lesser forms of homicide are included and instructions should be given if supported by the evidence.   However, the opinion completely fails to apply this test, holding instead that Gilson "has not shown that the greater offense of first degree murder was not committed." [10]   As this Court has frequently said, this is not the law.   The question is not whether evidence supported the greater offense, but whether evidence also supported any lesser offenses. [11]   Finally, the opinion suggests that Gilson is not entitled to lesser included instructions because

he claimed he was innocent of the crimes. [12] Any case law supporting this position predated *Shrum,* which includes no such provision. *Shrum* is clear, concise, and easy to apply: the jury should be instructed on lesser included offenses supported by the evidence. Evidence here supported those instructions, and the trial court should have given them. [13]

¶ 8 Finally, I believe the trial court abused its discretion in joining the two child abuse charges with the child abuse murder case. Admission of evidence that Gilson abused Isaac and Tia was tremendously prejudicial and could not have helped but affect the jury's decision on the murder charge.   The opinion concludes joinder was proper as the child abuse cases were in part alleged to have occurred "during the same time period" as the abuse leading to Shane Coffman's death. [14]   However, the opinion also notes that "once Shane died, Isaac and Tia began receiving the brunt of the discipline from Appellant." [15]   The child abuse counts were based on actions occurring primarily after Shane died.   Under these circumstances I believe any remote connection the child

---

**8.** *Romano v. State,* 1995 OK CR 74, 909 P.2d 92, 125, *cert. denied,* 519 U.S. 855, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996); Okla. Const. art. 7, § 15. I disagree with the majority's conclusion that the error in form in the verdict forms was harmless. I further disagree with the majority's disingenuous suggestion in footnote 3 that the jury did not wonder whether it should vote for a single option.   The verdict form for murder clearly shows the jury was divided as to the underlying theory. The majority notes that jurors sent out a note asking about the verdict form for Count I, charging abuse of Tia Coffman.   In answering the jury's question about Count I, the trial court directed jurors to the Instruction dealing with the underlying theory for *murder,* not child abuse.   I interpret this to mean the jury asked about the child abuse verdict form for Count I, were directed to the murder instruction, and took that as an answer to what must have been identical questions about the remaining two counts.   Why should they ask the question three times when one response was enough?

**9.** *Shrum v. State,* 1999 OK CR 41, 991 P.2d 1032. The opinion incorrectly attempts to modify *Shrum* by citing Tenth Circuit law to suggest we must look at whether evidence would permit a jury to acquit a defendant of the charged offense. This may be the law in the Tenth Circuit, but it is not the law in Oklahoma.

**10.** At 918.

**11.** *Le v. State,* 1997 OK CR 55, 947 P.2d 535, 546, *cert. denied,* 524 U.S. 930, 118 S.Ct. 2329, 141 L.Ed.2d 702 (1998).   The majority cites *Fairchild v. State,* 1999 OK CR 49, 998 P.2d 611, 627.   The analysis of lesser included offenses in *Fairchild* is an isolated and erroneous statement of law.   The majority also again relies on federal law, citing Tenth Circuit cases for this argument.

**12.** At 917.

**13.** It is difficult to reconcile (a) the opinion's conclusion that evidence did not support a finding of culpable negligence sufficient for second degree manslaughter, with (b) the opinion's conclusion that Gilson's actions supported a finding of reckless indifference to life sufficient to render him death-eligible.   Regarding the sufficiency of evidence to support the child abuse murder case, I once again disagree with the majority's reliance on the mistaken conclusion that child abuse murder is a general intent crime.   See *Fairchild,* 998 P.2d at 636 (Chapel, J., dissenting).

**14.** At 904.   The abuse was alleged to have occurred from July 1995, through February 1996.

**15.** At. 897.

abuse cases may have had with the murder case is substantially outweighed by the very real prejudice Gilson faced when the child abuse evidence was admitted. The only logical reason to join these cases was for reasons of judicial economy. While that is an important consideration, judicial economy can never be more important than a defendant's right to receive a fair trial.